**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2567-17T4
                  A-2843-17T4
                  A-4138-17T4

STATE OF NEW JERSEY,

       Plaintiff-Respondent,

v.

SHANE TIMMONS, a/k/a
SHANE JAMILL TIMMONS,

       Defendant-Appellant.

_____

STATE OF NEW JERSEY,

       Plaintiff-Respondent,

v.

JOSEPH D. KEARNEY,

       Defendant-Appellant.

_____

STATE OF NEW JERSEY,

       Plaintiff-Respondent,

v.

DANA S. KEARNEY,

  Defendant-Appellant.

_____

Submitted December 16, 2019 – Decided January 7, 2020

Before Judges Sabatino, Sumners and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 16-10-1645.

Joseph E. Krakora, Public Defender, attorney for appellant Shane Timmons in A-2567-17 (Michael James Confusione, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant Joseph D. Kearney in A-2843-17 (Frank M. Gennaro, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant Dana S. Kearney in A-4138-17 (Jay L. Wilensky, Assistant Deputy Public Defender, of counsel and on the brief).

Christopher L. C. Kuberiet, Acting Middlesex County Prosecutor, attorney for respondent (Joie D. Piderit, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the briefs).

PER CURIAM

These three related appeals, which we consolidate for purposes of this opinion, are pursued by defendants Dana S. Kearney, his cousin Joseph Kearney,

and Shane Timmons. Defendants were tried together in this homicide case, and found guilty of numerous crimes.

The State's proofs showed that the victim, Christopher Sharp, was stabbed to death after an altercation at a house party in Perth Amboy at the home of Alicia Boone. During the course of the party, an argument erupted between Sharp and the three defendants. Dana Kearney went upstairs and grabbed an object and returned. The victim was then stabbed fatally three times in the chest. Outdoor surveillance footage showed the three defendants leaving the house in the middle of the night. A bloody palm print of Joseph Kearney was found on the porch railing.

Boone and other witnesses provided testimony corroborating the altercation. Boone fled the house with her children in the middle of the night because the argument appeared to be escalating. When she returned later that early morning, Sharp had been killed.

The jury found Joseph and Dana Kearney were both guilty of conspiracy to commit murder and aggravated assault, that all three defendants were guilty of hindering the prosecution, and that Dana Kearney was guilty of endangering an injured victim and witness tampering.

The trial court sentenced Dana Kearney, the apparent stabber, to a fifty-

year aggregate custodial term. It imposed an aggregate thirty-year sentence upon Joseph Kearney, and seven years upon Timmons.

Defendants raise a host of arguments challenging their convictions and respective sentences. Having considered those arguments in light of the law and the record, we affirm.

TABLE OF CONTENTS

I. ...........................................................................................................5
   A.   Background...............................................................................5
   B.   Events Surrounding the Killing ...........................................6
   C.   The EMT Response and Crime Scene Investigation ..........11
   D.   Autopsy Findings ................................................................14
   E.   The Officers' Interviews ......................................................16
   F.   The Indictment ....................................................................18
   G.   Trial Testimony....................................................................19
      1.   Boone...........................................................................19
      2.   Evelyn..........................................................................19
      3.   The State's Experts .....................................................21
      4.   Character Witnesses for Defendants ...........................24
   H.   Motions................................................................................24
   I.   Verdict and Post-Trial Motions ..........................................25
   J.   Sentencing ...........................................................................25
II. .........................................................................................................26
III. Severance Issues – All Defendants.............................................28
   A.   Timmons...............................................................................30

  B.  Joseph .......................................................................................... 34

  C.  Dana ............................................................................................. 40

IV. Hindering – Timmons and Joseph ............................................ 44

  A.  Timmons ..................................................................................... 46

  B.  Joseph ......................................................................................... 48

V. Substitution of Juror No. 10 – Dana and Joseph ...................... 51

  A.  Substitution of Juror Ten ......................................................... 59

  B.  Length of Deliberations ............................................................ 60

VI. Non-Redaction of Evelyn's Assertions of Fear – Joseph and Dana .......... 64

VII. Confrontation – Timmons .................................................... 71

VIII. Late Discovery – Timmons ................................................. 73

IX. Fingerprint Evidence – Joseph ............................................... 78

  A.  Curran ........................................................................................ 82

  B.  Napp .......................................................................................... 83

X. Flight Charge – Joseph ........................................................... 87

XI. Excessive Sentences – Timmons and Dana ............................. 91

  A.  Timmons ..................................................................................... 92

  B.  Dana ........................................................................................... 97

XII. ............................................................................................. 101

I.

The State's evidence at trial adduced the following facts pertinent to our review.

A.  <u>Background</u>

As noted in our introduction, this case arises from the stabbing death of

Christopher Sharp at the home of Alicia Boone. Boone lived on William Street in Perth Amboy with her three children, and the youngest child's father, Dana.[1]

Boone's home had front steps leading to a porch. The front door opened into a small vestibule with steps leading upstairs. To the right, there was a living room area with a small coffee table and three couches, followed by a dining room area, another living room area, which Boone called the "kids' room," with another set of stairs, and the kitchen. The second level had bedrooms.

B. Events Surrounding the Killing

Boone testified that on August 17, 2013, Dana and Joseph were at her house when she arrived home from work with her children. At approximately 5:00 p.m., she left to take her children and her goddaughter, N.B., who was staying with them that night, to a local festival.

Tori Evelyn testified that on that same day, he and his cousin, Shane Timmons, also known as Jamel, went to Boone's home for a party to celebrate Timmons's birthday. Evelyn drove Timmons there in his mother's minivan. He did not recall the time they arrived in Perth Amboy.

Joseph (also known as "Hood") and Dana (also known as "Moose") were

---

[1] For stylistic reasons, we shall refer to Dana and Joseph Kearney by their first names.

at the house when Timmons and Evelyn arrived. They were playing cards, and Timmons joined them. Evelyn said other people also were present. At some point, a tall individual wearing a black t-shirt, later identified as Sharp, joined the card game. People were drinking alcohol at the party.

By the time Boone returned home with her children and N.B., there were "quite a few" people at her house. Dana, Joseph, Timmons, and Sharp were playing cards at a table in the living room area. Sharp, who was Boone's cousin, lived in another house in Perth Amboy with Boone's mother, Beverly Williams, and grandmother. Boone described Sharp as "very tall." Alcoholic beverages were present and Boone was "sure they were drinking."

Barry Gibbons, who lived with Boone's mother, arrived at her home before 9:00 p.m. to drop off Boone's sister Bria[2], her stepsister, B.G., and Bria's friends. Evelyn testified he was at the house when the "girls" arrived.

After entering the home, Gibbons saw Sharp asleep on a couch. Earlier that day, Dana told Gibbons that Sharp and Joseph had been drunk and "passed out" at Boone's house. Gibbons stayed at the house for about twenty minutes. Around 9:00 p.m., Boone and her children went upstairs to bed.

---

[2] Because Bria and Beverly Williams share the same surname, we refer to them by their first names, intending no disrespect.

A-2567-17T4

At 12:30 a.m. Boone went downstairs to get a drink of water. She saw Sharp passed out on the couch next to the coffee table in the living room. She also saw Joseph lying on the floor in his own vomit. Boone noticed the front door was open. Boone called Dana, who had left the house earlier with Timmons and Evelyn to go to "someone else's house." Boone told Dana the door was open and the house was in disarray.

Evelyn confirmed that a surveillance video recovered from a neighbor's house showed that he, Timmons, and Dana returned to Boone's house at 1:13 a.m. Boone testified that Dana came upstairs and told her Sharp had urinated on the floor and that Gibbons was at the house. Boone asked Dana to tell Gibbons to help with Sharp, but Gibbons apparently had left to drive Bria home.

Boone heard a "commotion" and went downstairs. She observed Sharp still sleeping on the couch and Dana cleaning and yelling at Sharp to get up. Joseph and Timmons were arguing. Boone and Dana went upstairs, where he changed into red shorts and a white tank top.

After Dana returned to the first floor, Boone heard another commotion. When Boone went back downstairs, Joseph and Timmons were still arguing, and Sharp was still sleeping. According to Boone, she told Dana to "leave Joseph alone." Then Sharp awoke and got between Dana and Joseph to keep them from

8

fighting. Boone asked Sharp to go with her to her grandmother's house, but he refused.

At some point, Boone grabbed Dana by his shirt and it ripped. She heard a crash and the sound of shattering glass. She thought it was the small table in the living room. By that time, Timmons had separated Sharp and Joseph, and had placed Sharp in a headlock on the couch with his other hand trying to hold off Joseph. Evelyn also tried to break up the fight, but Timmons and Joseph told him to go outside.

Boone decided to leave the house, explaining Sharp "was mad" and "getting ready to fight somebody." She went upstairs and woke her children and N.B.

Boone's oldest child A.B., who was age fifteen when the stabbing occurred, testified that Dana was already upstairs when she left her room, and that she saw him going into her mother's room and taking something off the nightstand. A.B. did not recall the object, but acknowledged that three days after the incident she told the police it was a black and silver switch blade, later explaining it was a folding knife switch blade. She thought Dana was getting ready to fight.

N.B., who was thirteen at the time, testified that she saw Dana grab a small

object from a desk or dresser beside the bed. Boone and N.B. also saw Dana in the bedroom before they went downstairs. E.B. and N.B. testified that Dana ran downstairs and went into the living room, where Joseph ran towards him. N.B. saw Dana raise both hands.

Boone and her children left the house and got into her car. Before she drove away, Dana came out of the house and entered the car, asking Boone to drive him to Plainfield. Instead, Boone drove Dana and her children to her mother's house. After the children went inside, Boone returned to the car. She drove Dana back to her house, and he went inside.

Evelyn testified that he was on the porch when he saw Dana leave the house without his shirt. He then went inside to get Timmons and saw "the dude in the black shirt" lying on his left side. Timmons was standing by the couch and Joseph was standing by a table. They told him to go outside.

Evelyn got into his van. Shortly afterwards, Timmons went to the van and told Evelyn that "they knocked him out. Like, he was hurt." Timmons returned to the house and left again with something in his hand, but Evelyn did not know what it was. Timmons got into the van, but told Evelyn to wait for Joseph, which he did.

At approximately 2:00 a.m., Gibbons arrived to check on Sharp. Dana

10

met Gibbons outside and said he and Sharp had gotten into a fight. He then got into the van before Evelyn drove off. Jose Rodriguez, the principal detective who worked on the case for the Middlesex County Prosecutor's Office, testified that Evelyn told law enforcement officers at his interview that everyone in the van was "nervous, not talking."

Gibbons testified that he went inside Boone's house, saw Sharp on the floor, and called 9-1-1. At some point, Gibbons spoke with Beverly over the phone and told her that "it doesn't look good." He told Beverly to go to her daughter's home "right now," and Boone said they drove over there.

C.    The EMT Response and Crime Scene Investigation

Dennis Petrick, an emergency medical technician ("EMT") for Raritan Bay Medical Center in Perth Amboy, and his partner, Gary Battista, received a dispatch from the Perth Amboy Police Department to respond to the house on William Street. They arrived on the scene at 2:04 a.m. A man, who appeared to be in his fifties (later identified as Gibbons), told EMT Petrick there was a man inside who was having difficulty breathing.

EMTs Petrick and Battista proceeded into the residence, where they found the victim on the floor with stab wounds to his chest. Battista checked the victim, but did not detect a pulse. After realizing it was a crime scene, the EMTs

left.

Officer Daniel Gonzalez of the Perth Amboy Police Department testified that he received a dispatch call around 2:00 a.m., and arrived at the William Street house about three or four minutes later. He met with other officers at the scene. On his way to secure the second floor, Officer Gonzalez observed the victim through a doorway. Afterwards, he went outside and spoke to Gibbons, Boone, and Boone's mother.

Perth Amboy Detective Marcos Valera arrived at the crime scene at approximately 3:00 a.m., and Police Sergeant Raj Chopra arrived about twenty minutes later. Detective Rodriguez arrived at approximately 3:30 a.m.

Valera, Chopra and Rodriguez conducted an initial walk-through of the crime scene. They went through the front door and entered the living room area, which Valera described as disheveled with couches "moved around." In the dining room area, he observed tables with bottles of alcohol on them. Valera saw the victim on the floor between the living room and dining room areas. Valera said it was apparent that "some type of altercation occurred." Valera, Chopra, and Rodriguez left the house to wait for members of the Police Department's Crime Scene Response Unit to arrive.

Valera and Rodriguez then searched the area around Boone's house. They

located two cameras attached to the front side of a neighbor's house. One camera faced Boone's lawn, driveway, and front porch, and the other faced the back of her house. Both cameras were recording that night.

After receiving the homeowner's permission, Rodriguez and Detective Frank Dinnino of the Prosecutor's Office wound back the recording to 2:00 a.m. when the call came into police headquarters, and determined the date and time on the surveillance video were consistent with live events.

Bree Curran, an investigator in the crime scene unit, arrived at 3:32 a.m. Curran walked through the residence with Valera and took photographs. She observed the victim on the floor of the "living room/dining room area," blood stains on the back of a couch, displaced furniture, a bloody towel and tank top on the living room floor, and broken bottle glass. She also found a bloodstained white t-shirt on the arm of a blue couch in the second living area between the dining area and kitchen.

Investigator Curran searched the residence for biological specimens. She located and documented the presence of blood on the front steps, the front door, and the doorknob. She found blood on the living room floor and wall, under the dining table, on a chair, on the floor in the foyer, and outside the family room, along with a bloody footprint on the living room floor. She collected blood

samples for later analysis.

Curran also searched the residence for latent fingerprints that were visible to the naked eye with the aid of oblique lighting and black fingerprint powder. Curran recovered a fingerprint in blood on the interior of the front storm door, and a bloody palm print on a porch railing.

She recovered more fingerprints on a mirror and various liquor bottles. She removed the prints for processing and transported all evidence to the crime scene lab.

According to Detective Rodriguez, the murder weapon was never recovered.

D.    Autopsy Findings

On the morning of August 18, 2013, Dr. Andrew Falzon, then the medical examiner for Middlesex County, performed the autopsy. Dr. Falzon was the State's expert at trial in the fields of medicine and anatomical, clinical and forensic methodology. Dr. Falzon determined that Sharp died of three stab wounds to the chest. The wounds were similar in appearance, but Dr. Falzon could not say with certainty whether they were made by the same knife.

Dr. Falzon testified that one wound was directed from front to back and "poked a hole" into the diaphragm, but did not penetrate the body cavity. The

14

second wound struck the sternum or breastplate, but did not penetrate the chest. The third stab wound was directed from front to back and to the right, passing through the intercostal space between the fifth and sixth ribs and penetrating the left lung, the heart, and the back of the left lung. This wound caused the lung and heart to bleed significantly into the chest cavity, compressing the lung and further preventing breathing. Dr. Falzon described the third wound as a "very extensive injury," and opined the victim would have died within a minute of the infliction of this stab wound.

Dr. Falzon also observed two bruises on the skin surface near the clavicle, a small cut on the ear, two abrasions or blunt force injuries on the right forearm, an abrasion on the fifth finger of the right hand, and bruising with some abrasions on the right upper back. There was hemorrhaging over the right eyebrow, which the doctor did not observe externally, caused by blunt trauma to the head. He did not observe any defensive wounds.

A toxicology report indicated the victim had a blood alcohol level of .211, which was more than twice the legal limit of .08 for driving under the influence.

In Dr. Falzon's opinion, to a reasonable degree of medical certainty, the manner of death was homicide and the cause of death was stab wounds to the chest.

E.    The Officers' Interviews

Detective Rodriguez and Officer Valera took video statements with an audio soundtrack from all three defendants. The recordings were played, with redactions, for the jury during Rodriguez's testimony. In Joseph's statement, he said he had gone to Boone's house the previous day and stayed overnight. According to Joseph, before the incident, people were "partying," he was playing cards with Timmons, "got too drunk," and fell asleep. Joseph claimed that when he awoke, he left the party with Timmons and Dana before the "incident went down," and went to a social club in Plainfield. When told by the officers that a surveillance video showed him leaving Boone's house around 2:00 a.m., Joseph repeatedly denied arguing or fighting with Sharp or seeing an altercation.

Dana, meanwhile, claimed he, Joseph, and Timmons left Boone's house and went to the club in Plainfield "no later than 12:30." Dana claimed Sharp was on the couch when he left. Dana similarly insisted that he, Joseph, and Timmons were not the people shown on the surveillance video.

Lastly, Timmons told Valera and Rodriguez he had arrived at the house on William Street at approximately 11:30 p.m. He "chilled" for about "forty-five minutes, thirty minutes," and then "dipped" with Dana and Joseph and went

to the club in Plainfield. When confronted with the existence of the surveillance video, Timmons insisted he was not lying. He denied that Dana was playing cards at all, that Evelyn was at the party, and said "nobody was arguing."

The detectives interviewed Evelyn twice. Rodriguez testified at trial that Evelyn said he left Boone's house at 11:45 p.m. with Joseph and Timmons. Evelyn told the detectives that during the thirty minutes he was there everyone was "chilling," and no one was arguing. After being shown the surveillance video, Evelyn confirmed the video showed a car driven by Timmons pulling into Boone's driveway at 1:13 a.m., and he, Timmons, and Dana getting out of the car. It also showed him on Boone's porch at 1:44 a.m., and showed Dana leaving the home without his shirt.

Detective Rodriguez interviewed Boone three times at the Perth Amboy police station. He also took statements from Gibbons. Valera, who had reviewed the surveillance footage for the period from 6:00 p.m. to 2:30 a.m., observed conflicts between the statements of Boone and Gibbons, and re-interviewed them both. According to Rodriguez, the investigators asked Gibbons for a second statement in order to identify Dana and Joseph in the photographs.

Boone was re-interviewed and segments from her video recording were

played for the jury. In her second statement, Boone expressed concerns for her family because Dana was "mean." She said her first statement to the officers was "90 percent true." She acknowledged initially telling detectives that Dana said he thought Boone was "cut," but told them in her second statement that Dana said he "poked" Sharp or "another word like that."

On August 21, Boone voluntarily returned to the police station and gave a third statement to the police. She said that Dana told her, "I poked Chris."

Valera testified the surveillance video confirmed Boone and the children left her house in the early morning hours of August 18, and Dana got into her car before she drove off. It also showed Dana returning to the house and going inside. Valera testified the stabbing incident occurred sometime around 2:00 a.m.

### F. The Indictment

A superseding indictment charged defendants with:

- second-degree conspiracy to commit aggravated assault, N.J.S.A. 2C:12-1(b)(2) and N.J.S.A. 2C:5-2(a) (Dana, Joseph, and Timmons) (count one);

- first-degree murder, N.J.S.A. 2C:11-3(a) and N.J.S.A. 2C:2-6(a) (Dana, Joseph and Timmons) (count two);

- third-degree endangering an injured victim, in

violation of N.J.S.A. 2C:12-1.2(a) (Dana and Timmons) (count three);

- second-degree hindering, N.J.S.A. 2C:29-3(a)(5) (Joseph and Timmons) (count four);

- second-degree hindering, N.J.S.A. 2C:29-3(b)(3) (Dana) (count five); and

- third-degree witness tampering, N.J.S.A. 2C:28-5(a) (Dana) (count six).

G. Trial Testimony

Nineteen witnesses testified at trial. None of the three defendants elected to testify on their own behalf.

1. Boone

In her testimony as a State witness, Boone recalled telling the police that Dana told her that he had "poked" Sharp. At trial, however, she did not recall that Dana said those words to her. She later admitted that Dana "probably" said he poked Sharp. Boone told the jury she loved Dana, but was afraid of him.

2. Evelyn

Evelyn expressed reluctance about answering questions at trial and after a lunch break, he feigned a lack of recollection even after reviewing his recorded statements to law enforcement officers. For example, Evelyn initially testified that he and his cousin arrived at Boone's house "probably like midday," and that

a fight broke out in the home between Dana and "the other guy." After the lunch recess, he could not recall details about the night of the stabbing, even when shown a transcript of his prior statements.

After redacting non-relevant information, the prosecutor played Evelyn's recorded statements for the jury. Contrary to his initial trial testimony, Evelyn told the police he and Timmons arrived at the party around 6:30 p.m., when it was still light outside. He said there were five or six people in the house, and three people were playing cards: Joseph, who wore a white t-shirt; Dana, who wore a black tank top, and had a rose tattoo on his arm; and a man in a black t-shirt, who was "at least six feet tall." Around 9:00 p.m., Evelyn left the party to buy some liquor.

According to Evelyn, by 1:30 a.m., there were four people in the house: "Jamel [Timmons], Hood [Joseph], Moose [Dana], and me." Around this time, the man in the black tank top (Dana) and the man in the black t-shirt (Sharp) began to argue. Evelyn, who was watching the card game, told them to "chill." The men continued to drink and play cards, so Evelyn went outside on the porch to smoke a cigarette. When he heard crashing, yelling and screaming, Evelyn went back inside and tried to break up the fight by stepping between the men. A "girl" came downstairs and also tried to break up the fight. Joseph and

20

Timmons told Evelyn to go outside, which he did.

Evelyn said he reentered the house but left again because the men were still fighting; the last time he went inside, he saw the man in the black t-shirt lying on his left side on the floor. Joseph, Dana, and Timmons were inside the house, and appeared to be "in shock." Evelyn said the victim looked "knocked out pretty bad or hurt."

Evelyn said he and Timmons went to the van, but Timmons returned to the house and exited with something in his hand. He waited for Timmons, Joseph, and Dana to get inside the van before driving away. Evelyn dropped off Joseph and Dana somewhere in Plainfield and drove home with Timmons.

On cross-examination, Evelyn did not recall how many people were in the house or playing cards or what defendants were wearing. He acknowledged lying to detectives about when he arrived at the party, when he left the party, and where he went afterwards. He admitted being concerned about going to jail when he spoke to the police.

### 3. The State's Experts

In addition to Dr. Falzon, the State presented testimony from two experts in the field of fingerprint identification: Curran; and Sergeant James Napp. Their testimony, which was objected to on certain grounds, is discussed in detail

21

in Part IX, infra.

The State also called Frank Basile, an expert in serology and DNA analysis. Defendants presented no expert witnesses.

Basile worked at the Union County laboratory, where he performed forensic DNA testing on the items delivered by Curran. He confirmed the presence of blood on the ripped tank top found on the living room floor, the white t-shirt found on a couch, and a swab from the palm print on the front railing. Basile took samples of the blood, generated DNA profiles, and analyzed the results using defendants' buccal swabs and Sharp's blood samples as references.

Basile concluded the DNA profile obtained from the stain on the exterior back right shoulder of the tank top matched Sharp's DNA profile. He explained that the DNA profile found on this specimen occurred in "1 in 21 quintillion African Americans, 1 in 9.4 quintillion Caucasians, and 1 in 17 quintillion Hispanics." The second stain on the exterior front lower abdomen area of the tank top contained DNA from a minimum of two individuals. He concluded Sharp matched the DNA profile of the major contributor to the mixture.

Basile tested five areas for the presence of blood on the white t-shirt, and obtained at least a partial DNA profile from each location. After comparing the

22

results with the reference samples, he concluded the DNA profiles from two bloodstains were a match to Joseph. He explained that statistics showed these profiles occurred in 1 in 5.3 quintillion African Americans, 1 in 40 quintillion Caucasians, and 1 in 7.2 Hispanics. DNA testing of a third bloodstain revealed a mixture from at least two individuals. Basile determined the DNA profile identified Sharp as the major contributor, and did not exclude Joseph as a minor contributor. He also detected blood in a fourth area, which yielded a single-source DNA profile that was a match to Sharp. The statistics showed the profile was rare such that "the probability of selecting an unrelated individual at random with the DNA types obtained from [this sample] is 1 in 9.4 quintillion Caucasians, 1 in 17 quintillion Hispanics, and 1 in 21 quintillion African Americans."

As for the palm print, Basile determined that the mixed sample of DNA did not exclude Sharp as a possible major contributor and Joseph as a possible minor contributor. Basile also tested eight of twelve fingerprint clippings from the victim's right hand and four clippings from his left hand. He found a positive association to Dana on one of the fingernail clippings from Sharp's right hand. Joseph was excluded as a possible foreign contributor to the mixture. The DNA on the four clippings from the left hand all matched to Sharp.

23

Basile testified that his analysis of data from the DNA and his conclusions went through an independent examination to confirm the statistics and the work performed.

### 4. Character Witnesses for Defendants

Defense counsel for Joseph presented two character witnesses: Joseph's aunt, who described her nephew as "a very sweet, loving young man," and a church pastor who described Joseph as "quiet" and "well-mannered."

Dana's counsel called Boone as a character witness. Boone testified that she told police during her first statement she did not recall Dana's exact words on the night of the incident. She acknowledged telling the police in her later statements that Dana said: "I poked Chris." She testified at trial that she was not sure at the time what Dana said to her.

### H. Motions

After the State rested its case, each defendant moved for a judgment of acquittal pursuant to Rule 3:18-1. The court granted Timmons's motion to dismiss counts one (conspiracy to commit aggravated assault), two (murder), and three (endangering an injured victim), but denied his request to dismiss count four (hindering the prosecution). The court denied the applications by Joseph and Dana to dismiss any of the charges against them.

### I. Verdict and Post-Trial Motions

Following deliberations, the jury found Dana, Joseph, and Timmons guilty on all counts.

Joseph subsequently moved for a judgment notwithstanding the verdict and a new trial. On December 22, 2017, the court denied both motions.

### J. Sentencing

At sentencing, the court merged Dana's and Joseph's convictions for conspiracy to commit aggravated assault (count one) into their convictions for murder (count two). It sentenced Dana on count two to a forty-year prison term with an eighty-five-percent period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2 ("NERA"), on count three (endangering an injured victim) to a term of five years to run consecutive to count two, on count five (hindering ) to a term of ten years to run concurrent with count two, and on count six (witness tampering) to a five-year term to run consecutive to count three. Dana received a total sentence of fifty years.

The court sentenced Joseph on count two to a thirty-year prison term without parole eligibility, and on count four to a five-year term to run concurrent with count two.

Lastly, the court sentenced Timmons on count four (hindering) to a term

of seven years.

## II.

On appeal, defendants present the following overlapping points in their briefs:

Timmons

Point I: The trial court erred in denying defendant's motion to sever the defendants for separate trials.

Point II:  The trial court erred in denying defendant's motion for acquittal of the hindering charge.

Point III:  The trial court violated defendant's right to confront the witnesses against him and attempt to raise reasonable doubt before the jury.

Point IV: The trial court erred in failing to afford defendant relief because of late discovery produced by the prosecution.

Point V: Defendant's sentence is improper and excessive.

Joseph Kearney

POINT I:  THE TRIAL COURT IMPROPERLY DENIED DEFENDANT'S MOTION TO SEVER DEFENDANTS.

POINT II: THE IMPROPER ADMISSION OF TESTIMONY FROM FINGERPRINT EXPERTS CURRAN AND NAPP DENIED DEFENDANT A FAIR TRIAL.

POINT III: DEFENDANT WAS ENTITLED TO A JUDGMENT OF ACQUITTAL ON THE CHARGE OF HINDERING THE PROSECUTION OF ANOTHER.

POINT IV: THE TRIAL COURT'S JURY INSTRUCTION ON THE DOCTRINE OF FLIGHT WAS ERRONEOUS.

POINT V: THE TRIAL COURT WRONGFULLY DENIED DEFENDANT'S MOTION FOR A NEW TRIAL.

Dana Kearney

POINT I.

THE TRIAL COURT ERRED IN SUBSTITUTING A JUROR AFTER DELIBERATIONS HAD PROGRESSED SUBSTANTIALLY, AND THE JURY CLEARLY DID NOT FOLLOW THE COURT'S INSTRUCTIONS TO DELIBERATE ANEW. U.S. CONST., AMEND. VI; N.J. CONST. (1947), ART. 1, PAR. 9. (Partially raised below).

A. The Court Erred in Substituting For a Juror After the Jury's Deliberations Clearly Had Progressed to a Stage Precluding Reconstitution.

B. The Reconstituted Jury Clearly Did Not Deliberate Anew.

C. Standard of Review.

27

POINT II.

THE TRIAL COURT ERRED TO DEFENDANT'S GREAT PREJUDICE IN REFUSING TO REDACT THE STATEMENT OF A KEY WITNESS. U.S. CONST., AMENDS. VI; XIV; N.J. CONST. ART. 1, PARS. 1, 10.

POINT III.

THE TRIAL COURT ERRED TO DEFENDANT'S GREAT PREJUDICE IN DECLINING TO SEVER THE DEFENDANTS, BECAUSE THEIR DEFENSES WERE ANTAGONISTIC. U.S. CONST., AMEND. XIV; N.J. CONST. (1947), ART. 1, PARS. 1, 10.

POINT IV.

THE TRIAL COURT IMPOSED AN EXCESSIVE SENTENCE, NECESSITATING REDUCTION.

We discuss these various arguments in a reorganized manner.

III.

(Severance Issues – All Defendants)

Defendants each argue the trial court erred by refusing to sever their trials into individual cases. We reject their contentions, and conclude the joint trial was proper under the circumstances.

The relevant procedural background is as follows. In July 2017, the trial court issued an oral decision denying Joseph's motion for severance, which

Timmons joined. The court agreed with the State's allegation that "defendants operated in concert together in this crime, and they're to be tried together" and found Joseph's severance arguments based on third-party guilt lacked merit. Dana did not join Joseph's motion, but asked for severance later during the trial.

The applicable law of severance is clear. "Two or more defendants may be tried jointly 'if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.'" State v. Brown, 170 N.J. 138, 159-60 (2001) (quoting R. 3:7-7). Courts generally prefer to try co-defendants jointly, "particularly when 'much of the same evidence is needed to prosecute each defendant.'" Id. at 160 (quoting State v. Brown, 118 N.J. 595, 605 (1990)). "That preference is guided by a need for judicial efficiency, to accommodate witnesses and victims, to avoid inconsistent verdicts, and to facilitate a more accurate assessment of relative culpability." Ibid.

A single joint trial, however, may not take place at the expense of a defendant's right to a fair trial. State v. Sanchez, 143 N.J. 273, 290 (1996). When considering a motion for severance, a trial court "should balance the potential prejudice to defendant's due process rights against the State's interest in judicial efficiency." Brown, 118 N.J. at 605 (quoting State v. Coleman, 46

N.J. 16, 24 (1965)).

Courts apply a rigorous test for granting severance. Brown, 170 N.J. at 160. A mere claim of prejudice is insufficient to support a motion to sever. State v. Moore, 113 N.J. 239, 274 (1988). A defendant also does not have the right to severance simply because he or she believes that a separate trial "would offer defendant a better chance of acquittal." State v. Johnson, 274 N.J. Super. 137, 151 (App. Div. 1994) (quoting State v. Morales, 138 N.J. Super. 225, 231 (App. Div. 1975)).

Our scope of review on this issue is limited. The decision to sever rests within the trial court's discretion. State v. Weaver, 219 N.J. 131, 149 (2014). An appellate court will defer to the trial court's decision on a severance motion unless it constitutes an abuse of discretion. Ibid.

We deal with each defendant, in turn, with respect to the severance issues.

A.    Timmons

Timmons argues the court erred by denying his motion for severance because he was "factually situated very differently" than his co-defendants, as reflected in the dismissal of the more serious charges against him. We reject this argument.

Timmons's counsel did not raise this argument at the hearing on the

severance motion. The court's decision addressed only Joseph's application, joined by Timmons, to sever the trial so he could raise the defense of third-party guilt.

"Where the evidence establishes that multiple offenses are linked as part of the same transaction or series of transactions, a court should grant a motion for severance only when defendant has satisfied the court that prejudice would result." Moore, 113 N.J. at 273. Although there is concern about "guilt by association" inherent in all joint trials, the danger by itself is not sufficient to sever if proper jury instructions can preserve the separate status of the co-defendants. Brown, 170 N.J. at 162. A defendant therefore is not entitled to a reversal of his or her conviction where the trial court's instruction adequately allowed the jurors to consider the defendant's guilt separately from his or her co-defendants. Ibid. (holding "jury was able to consider the co-defendant's guilt separately from defendant because it convicted them of different crimes.").

However, "where a significant portion of evidence to be adduced at a joint trial is admissible only as to one defendant, the probability of harm to the other may be so great that the trial judge should, as a matter of fair practice, exercise his discretion in favor of a severance." State v. Bellucci, 165 N.J. Super. 294, 300 (App. Div. 1979), modified on other grounds, 81 N.J. 531 (1980).

Here, the State used the same facts and witnesses to prosecute Timmons and his co-defendants. Three separate trials would have taken an undue amount of time. This case does not present a situation where a significant portion of the evidence was admissible only as to Dana and Joseph such that the probability of harm to Timmons was so great that discretion would favor a severance.

Moreover, the court gave adequate and timely protective instructions. Ibid. Specifically, the court instructed the jury in its final charge to "return separate verdicts for each defendant as to each of the charges being tried" and "to decide each case individually." It further instructed that the verdicts depended on the evidence and the counts of conspiracy to commit aggravated assault and murder applied only to Dana and Joseph.

The court therefore instructed the jury to consider the evidence against each defendant separately and to consider the guilt of each defendant individually as to each count. It is presumed the jury followed these instructions. See State v. Loftin, 146 N.J. 295, 390 (1996). Indeed, the jury manifestly was able to consider Timmons's guilt separately from co-defendants, as it convicted them of different additional crimes.

Timmons relies on State v. Savage, 198 N.J. Super. 507, 513 (Law Div. 1984), to argue that severance was required because, unlike co-defendants, he

was charged only with hindering. In <u>Savage</u>, one of the jointly indicted defendants was charged with capital murder and the other defendant was charged with hindering after the murder. <u>Id.</u> at 508-09. The hindering charge related to post-death efforts to find defendant and prosecute him for murder. <u>Ibid.</u> The court found that, '[u]nder these circumstances, where the alleged murder and post-murder events [we]re separate," severance was appropriate. <u>Id.</u> at 509.

In contrast, the murder of Sharp and the acts taken to evade apprehension and prosecution of that crime comprised "a common scheme or plan." <u>R.</u> 3:7-6. <u>See</u> <u>State v. Wilkins</u>, 219 N.J. Super. 671, 676 (Law Div. 1987) (holding joinder was proper where sufficient nexus existed between murder and witness tampering that occurred one month later to evade prosecution). Evelyn's testimony and the surveillance video showed Timmons leaving Boone's house with an object in his hand, likely the murder weapon, and Evelyn testified that Dana instructed Timmons and Joseph to adopt an alibi as they fled the crime scene. Given that the hindering charge arose from the same crime of murder, there were insufficient grounds for the court to sever Timmons's trial.

Moreover, appropriate jury instructions on the need for separate verdicts overcame any potential prejudice. Timmons had no right to a separate trial

based on the belief that it would have offered him a better chance of acquittal. Brown, 118 N.J. at 619.

The court therefore acted within its discretion when it denied the motion for severance as to Timmons.

B.    Joseph

Joseph contends the court erred by denying his motion to sever based on its finding that his proposed evidence of Dana's prior bad acts was inadmissible under N.J.R.E. 404(b) at a joint or separate trial.  He argues evidence of Dana's violent character and gang membership supported his defense of third-party guilt and such proof was admissible if tried alone.  We hold this evidence was inadmissible, even in a separate trial.

The trial court understood Joseph wanted "to point the finger" at Dana, and rely on witnesses that would say Dana was a "bad guy," "a gang member," and "violent."  The court rightly noted such bad character evidence would never be admissible against Dana, even if Joseph were tried alone.  The court agreed with the State that "defendants operated in concert together in this crime, and they're to be tried together."

Under N.J.R.E. 404(b), "[e]vidence of other crimes, wrongs or acts may not be introduced into evidence to prove a defendant's criminal disposition as a

A-2567-17T4

basis for establishing guilt of the crime charged." State v. Covell, 157 N.J. 554, 563 (1999). This rule, however, permits the admission of such evidence "to prove other facts in issue, such as 'motive, intent, plan, knowledge, identity, or absence of mistake or accident.'" Id. at 563-64 (quoting State v. Stevens, 115 N.J. 289, 293 (1989)).

An inherent danger of the admission of other-crimes evidence is that "a jury may convict a defendant not for the offense charged, but for the extrinsic evidence." State v. Garrison, 228 N.J. 182, 193-94 (2017). A court will admit evidence of other crimes only if: (1) relevant to a material issue; (2) similar in kind and reasonably close in time to the offense charged, (3) supported by clear and convincing evidence; and (4) its probative value is not outweighed by its apparent prejudice. State v. Cofield, 127 N.J. 328, 338 (1992).

However, where, as here, with respect to Timmons, "[w]hen a person charged with a criminal offense seeks to use other-crimes evidence defensively, the Cofield standard does not govern because 'an accused is entitled to advance in his defense any evidence which may rationally tend to refute his guilt or buttress his innocence of the charge made.'" Weaver, 219 N.J. at 150 (quoting State v. Garfole, 76 N.J. 445, 453 (1978)); see also State v. Williams, __ N.J. __, __ (2019) (slip op. at 12) (reiterating that the Cofield factors do not apply to

a reverse <u>Rule</u> 404(b) situation, but that principles of relevance and undue prejudice pertain). Generally, a defendant may introduce "similar other-crimes evidence defensively if in reason it tends, alone or with other evidence, to negate his guilt." <u>Ibid.</u> (quoting <u>Garfole</u>, 76 N.J. at 453).

As explained by the Court in <u>Weaver</u>, "even though 'a fairly rigid standard of similarity may be required' of the prosecution, when it is the defendant who 'offer[s] that kind of proof exculpatorily, prejudice to the defendant is no longer a factor, and simple relevance to guilt or innocence should suffice' as the admissibility standard." <u>Ibid.</u> (quoting <u>Garfole</u>, 76 N.J. at 452-53). "The defensive use of similar other-crimes evidence is sometimes referred to as 'reverse 404(b)' evidence." <u>Ibid.</u>

Although evidence of third-party guilt must be relevant, <u>State v. Fortin</u>, 178 N.J. 540, 591 (2004), "parties cannot introduce evidence that suggests a person is predisposed to commit wrongful acts to argue that the party committed the wrongful act at issue." <u>Weaver</u>, 219 N.J. at 149. A trial court must determine the probative value of the evidence is not substantially outweighed by the risk of "(a) undue prejudice, confusion of issues, or misleading the jury, or (b) undue delay, waste of time, or needless presentation of cumulative evidence." N.J.R.E. 403. "This determination is highly discretionary." <u>Weaver</u>, 219 N.J. at 151.

Joseph does not argue that evidence of Dana's violent nature and gang membership was admissible at his joint trial. In fact, Joseph concedes in his brief that such evidence was highly prejudicial to Dana. Instead, he argues this evidence would have been admissible at a separate trial to rebut his guilt and bolster his claim that Dana was solely responsible for Sharp's death.

The evidence proffered by Joseph does not provide any direct connection to Sharp's murder. There is no suggestion in the record that Dana previously threatened or attacked Sharp or anyone else. Likewise, there is no indication of a causal link between Dana's gang membership and the murder. Even if Dana was a gang member, there is no evidence that Sharp's murder was gang related.

Although Joseph claims the other-crimes evidence was admissible to show "motive, intent, plan and absence of accident," the evidence "simply afford[ed] a 'possible ground of suspicion against'" Dana. State v. Koedatich, 112 N.J. 225, 305 (1988) (holding evidence of third-party guilt did nothing more than cast "mere suspicions"). The relevance of the other-crimes evidence on the issue of who stabbed Sharp has not been established.

Notably, the proposed defensive use of this 404(b) evidence by Joseph does not "negate" Joseph's guilt of the crime charged against him. Weaver, 219 N.J. at 157 (quoting Garfole, 76 N.J. at 453). There was sufficient evidence for

the jury to find Joseph guilty even without the proffered evidence. Various witnesses placed Joseph in the room with Dana at the time of Sharp's murder, and the surveillance video showed him fleeing the crime scene with Dana and Timmons around 2:00 a.m., immediately after the stabbing. Evelyn confirmed that he drove Joseph from the scene, that Dana told Joseph and Timmons what alibi to give the police, and that Joseph, Dana, and Timmons seemed nervous.

Moreover, the evidence supports the jury's finding that Dana was the person who stabbed Sharp. The testimony established that immediately before the stabbing Dana ran upstairs, removed a small object from a table in the room he shared with Boone, ran back downstairs, and entered the room where the fighting took place with his hands in the air. Shortly thereafter, Dana left the house shirtless and got into the car with Boone and her children and asked for a ride to Plainfield. Boone testified that when they got to her mother's house, Dana said he "poked" Chris. In his closing argument, the prosecutor argued these were the actions of a guilty man and that Dana stabbed Sharp "with Joseph's help." Basile confirmed the presence of Sharp's blood on the ripped tank top, which belonged to Dana.

Thus, even if the other-crimes evidence suggested by Joseph was relevant, its probative value was substantially outweighed by the risk that its admission

would cause "undue delay, waste of time, or needless presentation of cumulative evidence." N.J.R.E. 403. See State v. Cook, 179 N.J. 533, 568-69 (2004) (affirming trial court's denial of the defendant's asserted evidence of third-party guilt, where probative value of proffered evidence was minimal).

Although the court below applied the Cofield analysis to consider Joseph's 404(b) other-crimes evidence, this error by itself does not require a reversal. No one disputes that evidence of Dana's bad character and his gang membership was inadmissible at the joint trial. It is unlikely the proffered evidence, if admitted at a separate trial, would lead to the success of Joseph's defense strategy of third-party guilt. In fact, the jury found Dana guilty of murder without evidence of his bad character or gang membership. Indeed, the State's theory of the case identified Dana as the man who stabbed Sharp, not Joseph. Thus, severance was not necessary to protect Joseph's right to a fair trial. The court's legal error in applying a 404(b) analysis to a reverse 404(b) stipulation was harmless. See, e.g., Weaver, 219 N.J. at 157, 162 (holding that court erred by relying on Cofield factors to deny motion to sever and exclude other-crimes evidence proffered by the defendant and that error by itself did not warrant reversal).

C.    <u>Dana</u>

Dana argues the court erred by denying his motion to sever because he and Joseph raised defenses that were "antagonistic at their core." We discern no such error.

While acknowledging he did not join Joseph's motion, Dana argues his trial counsel requested severance in the context of seeking to bar Joseph's statement to the police. Specifically, his counsel objected to a question by the interrogating officers asking what Joseph would do if he saw Dana stab someone. Joseph replied: "I don't know. I've never been in that situation." After arguing the question was highly prejudicial because it suggested to the jury that the police had information about Dana, his counsel requested severance.

The trial court found that the police sought to ask in different ways whether Joseph saw the stabbing and whether he would have told the police if he saw Dana "do something bad." It understood the concern that the statement might suggest to the jury the police knew something, but did not exclude the statement. The court explained:

> But the fact of the matter is that the Jury is going to hear evidence that the Defendant was at the scene, and if he's at the scene and now he lies to the police about being at the scene, that's an element of the crime

A-2567-17T4

that they have to prove.  So, I—I'm hard pressed to bar the State from introducing that statement, because that's part of their proofs in this case.

So, we'll give a—we'll give a[n] instruction to the Jury, a cautionary instruction to the Jury, and I think that should address or allay any concern that [Joseph's defense counsel] has.

The court suggested instructing the jury that a police officer's questions are "merely an interrogation technique" and are "not based on any particular information that they have."

During Detective Rodriguez's testimony, the State played for the jury Joseph's audio and video-recorded statement, including the question and answer about what he would do if he saw Dana stab somebody.  The court did not give a cautionary instruction before or after the playback of Joseph's statement.  At the charge conference, Dana's counsel did not ask the court to instruct the jury that an officer's question was an interrogation technique, and the court did not include such an instruction in its final charge.

A defendant generally is required to move for severance before trial.  R. 3:15-2(c); R. 3:10-2.  Because Dana did not move before trial, he must show plain error, that is, an error "clearly capable of producing an unjust result."  R. 2:10-2.  Dana must show plain error by making "a strong showing of probable prejudice in fact."  State v. Keely, 153 N.J. Super. 18, 22-23 (App. Div. 1977)

41

(quoting State v. Baker, 49 N.J. 103, 105 (1967)).  He has not done so.

Separate trials are required when co-defendants present defenses that "are not simply at odds, but are 'antagonistic at their core,' meaning that they are mutually exclusive and the jury could believe only one of them."  Weaver, 219 N.J. at 149 (quoting Brown, 118 N.J. at 606).  It is not enough to show "[t]he mere existence of hostility, conflict, or antagonism between defendants."  Brown, 118 N.J. at 606.  Defenses therefore are mutually exclusive if they "force the jury to choose between the defendants' conflicting accounts and to find only one defendant guilty."  Ibid.  "The fact that one defendant seeks to escape conviction by placing guilt on his or her co-defendant has not been considered sufficient grounds for severance."  Id. at 606-07 (holding that although the defendants gave conflicting versions, their defenses were not mutually exclusive because jury could find both of them at fault).

Dana argues he and Joseph presented defenses that were "antagonistic at the core" because they both blamed each other for Sharp's murder and therefore severance was necessary to ensure his right to a fair trial.  In support, he relies on closing arguments.  Dana contends Joseph's counsel primarily argued that he committed the murder, saying he had the knife in the living room, he told Boone that he "poked" Sharp, and witnesses reported seeing him grab a blade off a

nightstand upstairs and running downstairs "ready to fight." Joseph's counsel argued "[t]his was not Joseph's fight." Dana further argues his counsel sought to blame Joseph by referring repeatedly to the discovery of Joseph's fingerprints on a banister and doorframe.

The arguments of Dana's and Joseph's defense attorneys in summation did not establish versions of the events that were antagonistic, mutually exclusive, or irreconcilable. Similar to what occurred in Brown: "The jury could have believed that [Dana and Joseph] were both lying, and convicted them of all crimes charged; believed aspects of both of their stories, and fashioned a suitable verdict; or believed both of them completely, and acquitted them." Brown, 170 N.J. at 161.

Although neither Dana nor Joseph testified at trial, the jury heard their videotaped statements at trial. Both defendants gave similar descriptions of the events that took place before and after the stabbing. They also gave similar alibis to law enforcement officers.

The jury evidently did not believe the arguments of defense counsel because it found Dana and Joseph guilty of the more serious charges of murder and conspiracy to commit aggravated assault. The court duly instructed the jury to consider the evidence separately as to each defendant, and there is no reason

to believe the jury did not follow these instructions.

Thus, there was no error, let alone plain error, in the court's order denying the motion for severance.

IV.

(Hindering – Timmons and Joseph)

Count four of the indictment charged that "with purpose to hinder the detention, apprehension, investigation, prosecution, conviction or punishment of another for an offense," Timmons and Joseph "did prevent or obstruct by means of deception, anyone from performing an act which might aid in the discovery or apprehension of such person" in violation of N.J.S.A. 2C:29-3(a)(5).

At the close of the State's case, Timmons and Joseph moved pursuant to Rule 3:18-1 for a judgment of acquittal on this hindering charge. The trial court denied their motions. It found both defendants hindered the prosecution by creating a false alibi when they spoke to law enforcement officers, and that Timmons further hindered the prosecution by hiding the knife. Joseph and Timmons appeal that ruling.

Under Rule 3:18-1, a defendant is entitled to a judgment of acquittal at the close of the State's case, "if the evidence is insufficient to warrant a conviction."

The test is "whether, based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt." State v. Williams, 218 N.J. 576, 594 (2014). The evidence can be direct or circumstantial, State v. Reyes, 50 N.J. 454, 459 (1967), and "inferences need not be established beyond a reasonable doubt." State v. Tindell, 417 N.J. Super. 530, 549 (App. Div. 2011).

We review the record de novo to assess whether the State presented sufficient evidence to defeat a motion for a judgment of acquittal. State v. Dekowski, 218 N.J. 596, 608 (2014).

The hindering statute, N.J.S.A. 2C:29-3(a), provides that "[a] person commits an offense if, with purpose to hinder the detention, apprehension, investigation, prosecution, conviction or punishment of another for an offense . . . ," he or she:

> (5) Prevents or obstructs, by means of force, intimidation or deception, anyone from performing an act which might aid in the discovery or apprehension of such person or in the lodging of a charge against him.

An offense under paragraph (5) is a crime of the second degree, unless the actor meets certain exceptions, none of which apply here. N.J.S.A. 2C:29-3(a).

A.    <u>Timmons</u>

Timmons argues the evidence was insufficient to support his guilt of hindering. He argues the court's reliance on his attempt to create a false alibi was "legally insufficient" to support a charge of hindering.

In denying Timmons's request for acquittal on the hindering charge, the trial court explained:

> And he's going to remain—he's going to continue to stand trial on the hindering charge because there is substantial evidence—or at least giving the State the benefit of the favorable inferences, that he was trying to hide the knife and that he was trying to create a false alibi for the others and himself when he spoke to the police.

There was ample evidence to support the trial court's decision to deny Timmons's motion on this charge. The record establishes Timmons tried to create a false alibi by telling law enforcement officers that he arrived at Boone's home around 11:30 p.m., that he left about forty-five minutes later with Joseph and Dana, that he, Dana, and Joseph went to a club in Plainfield, and that they were at the club when Sharp died. Notably, to the contrary, Evelyn, Gibbons, and the surveillance video, placed Timmons, Joseph, and Dana inside Boone's home moments before and after the stabbing, and immediately before Gibbons discovered the body.

Evelyn testified that when he drove defendants away from the crime scene, Dana "came up with the idea" for defendants to tell the police that they left Boone's house around 11:30 p.m. and went to Plainfield, and that Dana told them "over and over again" to say they were there when Sharp died. Each defendant, including Timmons, gave the same false alibi in his statement to law enforcement officers.

Evelyn further testified that immediately before leaving the crime scene, Timmons returned to Boone's house and came outside with something in his hand. Evelyn confirmed the surveillance video also showed Timmons holding something when he exited the house, but Evelyn did not know what it was. Detective Rodriguez similarly testified that the surveillance video confirmed Evelyn's testimony that he left Boone's house after 2:00 a.m. with three passengers. Moreover, Timmons's defense counsel conceded in summation that Timmons "witnessed a killing" and "[h]e was told what to say, and he went along with it."

Based on these proofs, the jury had sufficient evidence to find that when Timmons gave his first statement to law enforcement, he violated the hindering statute by attempting to mislead his interrogators.

Timmons further argues his attempt to create a false alibi did not

constitute hindering because the evidence was "legally insufficient" to support such a charge. In support, he relies on State v. Valentin, 105 N.J. 14, 17 (1987), for the holding that a defendant "must take the initiative in providing false information," and "cannot be culpable if he responds falsely to questioning by law enforcement officers." Valentin, however, relied on a definition of hindering that has since been superseded by statute.

Specifically, when the Court decided Valentin, it was a crime to "volunteer" false information to police. Valentin, 105 N.J. at 17 (referring to the word "volunteer" in N.J.S.A. 2C:29-3(b)(4), addressing hindering of person who committed an offense). In 1999, the Legislature substituted the word "gives" for "volunteers" in N.J.S.A. 2C:29-3(a)(7) and N.J.S.A. 2C:29-3(b)(4). L. 1999, c. 297, § 1. Thus, contrary to Timmons's assertion, evidence that a defendant simply "gave" wrong information to an officer is sufficient to establish that he hindered another's apprehension or prosecution. In any event, Timmons was charged here with hindering under a different subsection of the statute, N.J.S.A. 2C:29-3(a)(5), so this argument has no merit.

B. Joseph

Joseph similarly contends the court erred by failing to grant him a judgment of acquittal on the hindering charge. He argues N.J.S.A. 2C:29-

3(a)(5) requires "more than simply lying to a police officer to prove a second-degree offense, otherwise the third-degree offense set forth in N.J.S.A. 2C:29-3(a)(7) would be rendered superfluous."

The trial court found the evidence showed Joseph went voluntarily to police headquarters and purposely gave a false narrative about leaving Boone's home before the killing occurred and going to a nightclub in Plainfield. It found this "false alibi" by Joseph was "deception."

Joseph contends that, at most he could only be found guilty of third-degree hindering under N.J.S.A. 2C:29-3(a)(7). N.J.S.A. 2C:29-3(a)(7) provides that a person commits an offense if he or she "[g]ives false information to a law enforcement officer" with the purpose of hindering the detention, apprehension, investigation, prosecution, conviction or punishment of another. An offense under paragraph 3(a)(7) is a crime of the third degree. N.J.S.A. 2C:29-3(a). As explained by the Senate Budget and Appropriations Committee Statement with Committee Amendments to L. 215, c. 265 (Jan. 27, 2016), it is a third-degree crime to "give false information to a law enforcement officer if the illegal conduct which is charged would constitute a crime of the first or second degree."

Joseph challenges the prosecutor's statement to the trial judge that "the proof of both [N.J.S.A. 2C:29-3(a)(5) and N.J.S.A. 2C:29-3(a)(7)] are similar,"

and that "[i]f [the State] proved he lied to the police, we prove he deceived them." He claims the judge mistakenly agreed with the prosecutor.

Joseph acknowledges N.J.S.A. 2C:29-3(a)(5) requires a defendant to use force, intimidation or deception, but claims the facts here show otherwise. He denies preventing or obstructing the investigation by refusing to confess or implicate Dana in light of the testimony of Boone and her children, the physical evidence, and the surveillance video. He therefore argues the jury wrongly convicted him of second-degree hindering for refusing to cooperate with the police, when at most his conduct was only a third-degree offense under N.J.S.A. 2C:29-3(a)(7). We disagree.

"The sentencing prerogatives of the prosecutor, a member of the executive branch, include 'determin[ing] the extent of a defendant's sentencing exposure when deciding what charges will be brought.'" State v. A.T.C., 239 N.J. 450, 468 (2019) (quoting State v. Lagares, 127 N.J. 20, 27 (1992)). "The grading of the offense is dependent upon a defendant's conduct and the nature of the underlying charge." State v. Young, 448 N.J. Super. 206, 223 n.12 (App. Div. 2017). "Generally, where specific conduct may violate more than one statute, the more serious grade or offense will govern." State v. D.V., 348 N.J. Super. 107, 115 (App. Div. 2002).

"[T]he selection of the charge rests in the sound discretion of the prosecutor." State v. Moorer, 448 N.J. Super. 94, 104 (App. Div. 2016). However, "[w]here it is clearly and convincingly shown that an exercise of prosecutorial discretion is arbitrary, capricious or otherwise constitutes a patent or gross abuse of discretion, the judiciary will intervene." D.V., 348 N.J. Super. at 116.

The record supports the court's finding that Joseph acted with deception to hinder Dana's apprehension and prosecution by giving a false alibi to the police. In essence, defendants made a concerted effort to conceal their involvement with the nightclub story. The prosecutor did not abuse his discretion by charging Joseph with the more serious offense of second-degree hindering under N.J.S.A. 2C:29-3(a)(5). Accordingly, the trial court did not err by denying Joseph's motion for a judgment of acquittal on that charge.

V.

(Substitution of Juror No. 10 – Dana and Joseph)

Dana and Joseph contend the court erred by substituting juror number ten after deliberations had progressed substantially and the reconstituted jury did not follow its instructions to deliberate anew. Joseph argues the court wrongfully denied his motion for a new trial on this issue. Dana, who did not

move for a new trial, argues the court's decision to substitute the juror was highly prejudicial and constituted plain error. We are unpersuaded by these contentions. The events unfolded in this fashion.

On August 31, 2017, at 2:39 p.m., the jury began its deliberations. It ended deliberations at 4:26 p.m., after deliberating for one hour and forty-seven minutes.[3]

Deliberations resumed on September 5, 2017, at 10:37 a.m. and continued until 12:22 p.m., a total of one hour and forty-five minutes. At that time, the jury sent a note to the judge asking a question about passion/provocation manslaughter and requesting to view the "video testimonies" of Boone and Dana. The jury then took a lunch recess.

After the jury returned to the courtroom, the court answered the question on passion/provocation manslaughter and then played an excerpt of Dana's video statement from 1:55 p.m. to 2:16 p.m., a total of twenty-one minutes. Five seconds before the court paused the playback, juror number five asked: "Are we able to just go in a room, talk for a couple minutes," saying the jury did not need to see the "whole thing." Another juror apparently agreed. The trial judge

---

[3] In his brief, Dana asserts that on the first day the jury deliberated for "one hour and 46 minutes" and that it began deliberations on the second day at 10:38 a.m.

A-2567-17T4

advised the jury that he could not take a request from one juror, "although others seem to be acquiescing to your request," and instructed them to return to the jury room to "[t]alk about this."  If the jurors wanted to re-listen to the video as initially requested, the judge told them to send out a request and he would continue the playback and if not, they should continue to deliberate.

At that point, juror ten asked if court would recess at 3:00 p.m., saying: "I have a class at four, and then with my kids and everything else, if we don't get this done by today, I can't come back.  Like, I have no sitter."  The trial judge replied:  "[Y]ou've got to come back, you're on the jury."

At sidebar, the judge and counsel discussed juror ten's scheduling problem.  The judge noted the jury had deliberated for a short time on a trial that lasted two months.  The judge sent the jurors back to the jury room and directed them to stop deliberations and not to talk about the case.  After discussing the matter further, counsel agreed it was not too late to reconstitute the jury.  The judge noted in the record that counsel agreed the jury in this "lengthy trial" had not deliberated "for an inordinate amount of time," that the jury had actually deliberated "a very short time," that it was "not inappropriate to reconstitute the jury," and that the newly constituted jury had to commence their deliberations again.  At the request of Joseph's counsel, the judge and co-counsel agreed to

53

replace juror ten with an alternate other than juror fourteen, who had slept through some of the proceedings.

After the jury returned to the courtroom, juror number one, who was pregnant with twins, indicated at side bar that she could not stay after 3:00 p.m. for a medical reason. The parties agreed to stop at 3:00 p.m. After sidebar ended, the court advised the jury that juror one had an appointment at 4:00 p.m. and then excused juror ten and replaced her with an alternate. It then sent the jury, including juror one, back to deliberate after giving the following instruction:

> Ladies and gentleman, as you–as is evident here, Juror Number 10 has been excused from the jury. As— an alternate, Juror Number 2 has been selected to take her place. Now, you—you know why she is not here, and this is a personal matter. It was personal to her. It had nothing to do with her relationship with other members of the deliberating jury. She had child care issues.
>
> So, as of this moment you are a new jury and you must start your deliberations over again. The parties have the right to a verdict reached by 12 jurors who've had the—the full opportunity to deliberate from start to finish. The alternate juror, Juror Number 2, has no knowledge of any earlier deliberations. Consequently, the new deliberating jury must start over at the very beginning of deliberations.
>
> Each member of the original deliberating jury must set aside and disregard whatever may have

A-2567-17T4

occurred and anything which may have been said in the jury room following my instructions to you. You must give no weight to any opinion expressed by Juror Number 10 during deliberations before that juror was excused. Together as a new jury you must consider all evidence presented at trial as part of your full and complete deliberations until you reach your verdict.

I will send you now out to commence your deliberations. I'll bring you back in at 3:00.

The reconstituted jury began its deliberations at 2:33 p.m. and returned to the courtroom at 3:09 p.m., a total of thirty-six minutes. It sought no additional playbacks before rendering the verdicts. The jury found defendants guilty on all counts.

The trial court rejected Joseph's motion for a new trial based on the replacement of juror ten. It cited State v. Williams, 171 N.J. 151, 169 (2002), and explained there was no "bright-line rule" with respect to the question of whether jury deliberations had progressed too far to permit substitution of an alternate juror. The court further explained the question required consideration of the length of time a jury had deliberated and the effect that progress in deliberations had on the reconstituted jury's ability to begin deliberations anew. (citing State v. Jenkins, 182 N.J. 112, 132 (2004)).

With respect to timing, the court noted it had polled every attorney in the case regarding the position of the parties. The State and all defense counsel

agreed to the juror's replacement and urged the court to act immediately before further deliberations occurred. The court also noted it offered to compel juror ten to remain, but that it "acceded to the request of all the attorneys and—and removed that juror."

The court found the original jury had deliberated for approximately two-and-a-half hours and that it had not reported reaching a partial verdict. Although there was "a lot of evidence," the court found the jury had heard it "many, many times" through various witnesses and playbacks. It found that "even in closing arguments by counsel . . . [t]here was a playback of the surveillance tape where the jury was able to repeatedly view what was occurring outside the residence."

The court gave the jury specific instructions about commencing their deliberations anew. It concluded:

> There's no indication that because the jury deliberated for 36 minutes that somehow the defendant suffered a manifest denial of justice as a result of the [reconstituted] jury. There was an overwhelming amount of evidence in this case in which the jury could rely on in reaching a quick verdict.

The trial court's handling of these issues was sound.

Rule 1:8-2(d)(1) provides that, after a jury begins its deliberations, the court may not substitute an alternate juror unless "a juror dies or is discharged by the court because of illness or other inability to continue." When a

56

substitution is made, the court must instruct the jury "to recommence deliberations" and to give "such other supplemental instructions as may be appropriate." R. 1:8-2(d)(1).

Rule 1:8-2(d)(1) balances the goals of the right to a fair trial and judicial economy. State v. Musa, 222 N.J. 554, 565 (2015); Jenkins, 182 N.J. at 124. Given these competing interests, "the trial court must determine the cause of the juror's concern and assess the impact of the juror's departure on the deliberative process." State v. Ross, 218 N.J. 130, 147 (2014). Then, "in light of the timing of the juror's dismissal and other relevant consideration, the trial court must ascertain whether a reconstituted jury will be in a position to conduct open-minded and fair deliberations." Ibid.

A court cannot replace a deliberating juror with an alternate "unless the record 'adequately establish[es] that the juror suffers from an inability to function that is personal and unrelated to the juror's interaction with the other jury members.'" Jenkins, 182 N.J. at 124-25 (quoting State v. Hightower, 146 N.J. 239, 254 (1996)). A trial court must determine whether personal issues or troubled relationships in the jury room prompted a juror to seek removal in the midst of deliberations. Ross, 218 N.J. at 149. It also should consider whether a reconstituted jury could meaningfully evaluate and discuss the case. Ibid.

A-2567-17T4

"No bright line rule in respect of the length of jury deliberations triggers a finding that deliberations have progressed too far to permit the substitution of an alternate." Ibid. (quoting Williams, 171 N.J. at 169). In lieu of a bright line rule, a judge should consider such factors as "the timing of the juror's departure, his or her explanation of the problem prompting the inquiry, and communications from the jury that may indicate whether deliberations have progressed to the point at which a reconstituted and properly charged jury will be unable to conduct open and mutual deliberations." Ibid.

If a court permits the substitution of an alternate juror for an excused juror, it must provide instructions to the newly reconstituted jury before its deliberations. Ibid. It should charge the jury as follows:

> the excused juror's departure was prompted by personal issues, rather than by his or her view of the case or relationships with other jurors, that the reconstituted jury should not speculate on the reasons for the juror's departure, and that the jury should begin deliberations anew by setting aside their previous discussions so that the reconstituted jury may conduct full and complete deliberations.
>
> [Ibid.]

An appellate court's review of a trial court's decision to remove or substitute a deliberating juror is deferential. Musa, 222 N.J. at 564-65. We will not reverse a conviction on this basis absent a proven abuse of discretion. Id. at

565.

A.    Substitution of Juror Ten

Joseph and Dana argue the court erred by substituting juror ten after jury deliberations had progressed significantly.  Joseph acknowledges the court replaced juror ten by mutual consent, but argues the parties mistakenly concluded that deliberations had not progressed to the point where substitution was no longer an option.  Dana, meanwhile, argues that remarks by jurors that they did not need to hear the remainder of the playback of his testimony indicated the jury "had resolved the issue of identity and was focusing on the applicability [of the] passion-provocation manslaughter, before the jury was reconstituted."

A court can remove a juror for "purely" personal reasons "without fear that the ultimate verdict's validity has been compromised."  Jenkins, 182 N.J. at 130.  Personal reasons may include a juror's "illness, need to attend to a sick relative or child-care responsibilities, [or] financial hardship due to absence from work" or "the need to meet a family emergency."  Musa, 222 N.J. at 570 (holding juror's failure to appear on second day of deliberations amounted to "inability to continue" under Rule 1:8-2(d)(1)).

Here, the court justifiably removed juror ten for childcare reasons.  The

court met with the juror at sidebar to ascertain her childcare needs and advised the jury of the reason for dismissal. Her removal amounted to an "inability to continue" under Rule 1:8-2(d)(1), based on personal reasons.

Notably, defense counsel did not object below to the removal of juror ten and agreed that it was not too late to reconstitute the jury. Dana's claim that the jurors' comments during a pause in the readback of his testimony indicated the jury had already reached "significant decisions" is nothing more than speculation.

The trial court therefore did not commit plain error by excusing juror ten for reasons personal to her and at the urging of all counsel.

B.    Length of Deliberations

Joseph and Dana contend the reconstituted jury ignored the instruction to deliberate anew. They argue the reconstituted jury deliberated only thirty-six minutes, which was an insufficient amount of time to consider testimony of at least twenty witnesses and review 384 exhibits over twenty days of trial involving three defendants on multiple charges. We reject these claims.

In making a decision whether to substitute a juror during deliberations, courts consider the timing of a juror's departure, the reasons for the departure, and any communications from the jury indicating whether deliberations had

progressed to a point where a reconstituted jury would be unable to conduct "open and mutual deliberations." Ross, 218 N.J. at 149. The Model Criminal Jury Charge, on which the court below relied, "accurately and concisely conveys these instructions." Id. at 151-52 (citing Model Jury Charges (Criminal), "Judge's Instructions When Alternate Juror Empaneled After Deliberations Have Begun" (rev. Mar. 14, 2016).

Joseph relies on Jenkins, 182 N.J. at 112, which is factually distinguishable. In that case, a deliberating juror became emotional during deliberations and told the judge at sidebar that she could not agree with what the jury wanted. Id. at 119. She agreed with the judge that "[b]ut for the emotional factor," the case was already resolved. Id. at 122. The judge determined the juror was "unable to continue according to the case law," and "removed her from the panel." Id. at 122-23. The reconstituted jury resumed deliberations and returned a guilty verdict twenty-three minutes later. Id. at 123.

The Court concluded in Jenkins that the reasons for the juror's removal were personal to her, but that her colloquy with the judge indicated the remaining jurors were about to convict the defendant and therefore jury deliberations had advanced too far to permit a substitution with an alternate juror. Id. at 131. In support of its assessment that the "die appear[ed] to have

61

been cast," the Court stated that the return of a verdict in twenty-three minutes lent "credence to the argument that minds were closed when the alternate joined the deliberations." Id. at 133. It therefore held that the trial court erred by failing to declare a mistrial. Ibid. Thus, in Jenkins, the Court did not look solely at the length of the reconstituted jury's deliberations. Instead, it considered the juror's reasons for seeking removal and her statements to the court that indicated deliberations had progressed too far to permit the substitution of an alternate.

By contrast, the record in this case does not compel the conclusion that the trial judge's decision to replace juror ten constituted an abuse of discretion. During deliberations, the jury requested playbacks of the videos of Boone's and Dana's statements. These requests suggest the jury's uncertainty concerning guilt or innocence of defendants. Indeed, there is nothing in the record to suggest the original jurors had reached a decision as to any factual or legal issue or that the reconstituted jury was unable to engage in open-minded discussions. The request by a juror to return to the jury room, which was spoken out of turn, was insufficient to permit the judge to determine that jury deliberations had progressed too far to permit a substitution.

Unlike the excused juror in Jenkins, juror ten did not suggest that the other jurors had reached any decisions on guilt or innocence.

Notably, all counsel agreed with the prosecutor that the jury had not deliberated "beyond a point" where it could be reconstituted. Because counsel for Joseph and Dana asked the court to reconstitute the jury, and the court did so, they cannot now claim the procedure they requested below was error and prejudicial. State v. Jenkins, 178 N.J. 347, 358 (2004) (holding criminal analog of the invited error doctrine prevents defendants from manipulating the system). See also State v. A.R., 213 N.J. 542, 561 (2013) (acknowledging the "common sense notion" that a "disappointed litigant cannot argue on appeal that a prior ruling was erroneous when that party urged the lower court to adopt the proposition now alleged to be error.") (internal citations omitted).

There also is no support in the record for the claim by Joseph and Dana that the court rushed the jury to reach a verdict "before the 3 p.m. deadline." Both Joseph and Dana claim the jury quickly reached a verdict based on juror one's medical condition. The court, however, only instructed the jury that juror one had an appointment at 4:00 p.m. and that deliberations would end that day at 3:00 p.m. The court also instructed the jurors to consider "all evidence" and conduct "full and complete deliberations" until it reached a verdict. It is presumed the jury followed these instructions. Loftin, 146 N.J. at 390.

We decline to speculatively assume that the replacement juror did not

meaningfully contribute to the deliberations simply because the jury deliberated for about a half hour. Given the overwhelming evidence, including the video statements, the surveillance video, the testimony of witnesses, law enforcement officers, and experts, the jury could have quickly reached its verdicts. The court appropriately instructed the reconstituted jury to begin deliberations anew, and we must presume the instruction was heeded.

We further note that although there was extensive testimony for the jury to consider, the evidence against defendants was very strong and the jury reached different verdicts based on each defendants' individual culpability.

In sum, the trial court did not abuse its discretion when it dismissed juror ten and directed the reconstituted jury to begin deliberations anew. Likewise, it did not err by denying Joseph's motion for a new trial based on the lack of jury deliberations.

## VI.

(Non-Redaction of Evelyn's Assertions of Fear – Joseph and Dana)

Joseph and Dana contend the trial court erred by admitting into evidence Evelyn's two statements without any redactions for expressions of fear. Joseph argues the risk of prejudice from Evelyn's repeated statements that "he would be murdered if he talked" far outweighed their probative value, and that the court

erred by denying his motion for a new trial without "specifically referencing N.J.R.E. 403." Dana argues the court's refusal to redact Evelyn's expressions of fear violated Evidence Rules 403 and 404(b) and his constitutional right to a fair trial. We conclude the court did not err by admitting Evelyn's statements without these redactions.

The pertinent context is as follows. On August 20 and 21, 2013, Evelyn gave two recorded statements to the police. He gave the second statement after viewing the surveillance video. At that time, Evelyn changed his initial statement and acknowledged that he did not leave Boone's home on the night of the murder until after Gibbons arrived at approximately 2:00 a.m.

At trial, Evelyn testified about events that occurred on the evening of Sharp's death, but after a lunch break he repeatedly claimed a lack of recollection even when shown a transcript of his statements. The court conducted a Gross hearing at which the prosecutor played Evelyn's statements through the testimony of Rodriguez. At various times in his statements, Evelyn was reluctant to answer questions, saying the police would be investigating his own murder next. He referred to himself as "definitely dead" if he testified, explaining "they're definitely gonna come after me," that "people on the streets talk," and that "[t]here's rules on the streets."

After the playback of the first statement, Joseph's counsel argued Evelyn's expressions of fear were "[h]ighly prejudicial." The court indicated that based on what it heard, the jury needed to understand why Evelyn lied to the police. It found the expressions of fear were relevant because they provided "one explanation" for why Evelyn initially was "somewhat forthcoming" in court, but after lunch claimed he had no recollection of the details even after viewing transcripts to refresh his memory.

At the conclusion of the <u>Gross</u> hearing, the court found that Evelyn was feigning a lack of recollection based on a fear of the consequences. After reviewing the fifteen <u>Gross</u> factors, the court concluded that the statements were reliable and admissible as prior inconsistent statements under N.J.R.E. 803(a)(1). The court acknowledged Evelyn's expressed fear of "being the subject of a homicide investigation himself were he to cooperate with the police," but found that his only motive in expressing reluctance to cooperate was "to protect his friends, his cousin, and also to protect himself."

After the court's ruling, Dana's counsel sought to redact "all things such as, obviously, [Evelyn's statement] I'm a dead man on the street." The court noted it had to balance any prejudice against the probative value of the evidence. In the court's view, Evelyn's expressions of fear were highly probative to explain

why he did not want to testify.

In his later motion for a new trial, Joseph's counsel raised the redaction argument, claiming Evelyn's expressions of fear inferred that defendants were dangerous people who would retaliate if he told the truth and that their prejudicial effect outweighed any probative value. The court found that Evelyn appeared in court to testify and swore to tell the truth, that the State had no notice of Evelyn's lack of recollection before he testified, and that defense counsel had the opportunity to cross-examine him. It concluded:

> So it was the jury's decision to determine what credit should be afforded to his . . . prior recorded statement to the police. It's not for this Court to interfere with that fact-finding function of the jury. Therefore, that does—there was no manifest denial of justice on these grounds.

The trial court's rulings on this issue comported with the applicable law.

Evidence Rule 403 "mandates the exclusion of evidence that is otherwise admissible 'if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence.'" State v. Cole, 229 N.J. 430, 448 (2017) (quoting N.J.R.E. 403). To determine undue prejudice, the inquiry is "whether the probative value of the evidence 'is so significantly outweighed by [its] inherently inflammatory potential as to have a probable

capacity to divert the minds of the jurors from a reasonable and fair evaluation of the' issues." Ibid. (quoting State v. Thompson, 59 N.J. 396, 421 (1971)). Thus, "the mere possibility that evidence could be prejudicial does not justify its exclusion." State v. Wakefield, 190 N.J. 397, 429 (2007) (quoting State v. Koskovich, 168 N.J. 448, 486 (2001)).

A trial court has broad discretion under Rule 403 to exclude evidence that might be prejudicial or that might divert a jury's focus from relevant issues in the case. State v. McGuire, 419 N.J. Super. 88, 135 (App. Div. 2011). When a trial court weighs the probative value of evidence against its prejudicial effect pursuant to N.J.R.E. 403, its ruling should be overturned only if it constitutes "a clear error of judgment." Koedatich, 112 N.J. at 313. An appellate court will affirm a trial court's decision unless it was "so wide of the mark that a manifest denial of justice resulted." McGuire, 419 N.J. Super. at 135 (quoting State v. Lykes, 192 N.J. 519, 534 (2007)).

Contrary to Joseph's assertion, the court conducted the required "balancing" under Rule 403, and found that Evelyn's expressions of fear were prejudicial but "highly probative" to explain why Evelyn did not want to testify. The record supports the court's conclusion.

Evelyn expressed a fear of testifying in his statements to the police and a

failure of recollection at trial. The jury, however, had the opportunity to observe his demeanor on the video recordings of his statements. By viewing these recordings, the jury could assess Evelyn's "facial expressions and gestures as well as his words," and determine whether his expressions of fear were "strategic or sincere." Cole, 229 N.J. at 451. The jury also had the opportunity to observe his demeanor at trial, and defense counsel had the opportunity to cross-examine him. The court properly instructed the jury that it was their role to assess the credibility of the witnesses.

The trial court therefore did not abuse its discretion by admitting Evelyn's statements without redacting his expressions of fear. As the court below found, his statements were highly probative to explain why he did not want to testify. The possibility that this evidence might be prejudicial by suggesting that defendants or their associates were dangerous men did not justify its exclusion. Instead, Evelyn's expressions of fear provided important context for his changing statements and lack of recollection, and explained his conduct as a witness.

Dana also argues that Rule 404(b) requires the exclusion of Evelyn's expressions of fear because they accuse him of "bad character" and suggest he committed another bad act. Dana, however, did not raise this objection at trial.

Instead, he argued below that the admission of Evelyn's assertions were "incredibly prejudicial," that they were "clearly stuff that ha[d] to be redacted," and that he wanted to redact "all things such as, obviously, I'm a dead man on the street." On appeal, he now argues the court erred by not excluding this evidence under Rule 403, "as reinforced by N.J.R.E. 404(b)."

N.J.R.E. 404(b) applies to evidence of "other crimes, wrongs or acts . . . ." This rule recognizes that evidence of other crimes can be unduly prejudicial and therefore inadmissible when offered solely to prove a defendant's guilt of the crime charged. State v. Rose, 206 N.J. 141, 159 (2011). However, if the misconduct evidence is material to a non-propensity purpose, it may be admissible "if its probative value is not outweighed by the risk of prejudice." Ibid.

Evelyn's expressions of fear do not assert a bad act or wrong individually on the part of Joseph or Dana. He did not testify that, more generically, he feared reprisal from them, but only that he was afraid of being killed if he testified. He could have been expressing his fear of retaliation from their family members or other members of the community. See State v. Byrd, 198 N.J. 319, 341 (2009) (recognizing a "persistent problem of witness intimidation in New Jersey"). Moreover, his fears were vague. Because Evelyn's expressions of fear

do not implicate uncharged bad act evidence, a Rule 404(b) analysis is not required.  Rose, 206 N.J. at 179 (addressing the viability of res gestae).  Thus, this evidence does not meet the threshold determination under Rule 404(b) to relate to "other crimes."  Ibid.

In addition, neither Joseph nor Dana challenge the court's ruling that this evidence was reliable and admissible as prior inconsistent statements under N.J.R.E. 803(a)(1)(A).

The trial court did not err or misapply its discretion by admitting Evelyn's statements, without redactions for his expressions of fear.

## VII.

### (Confrontation – Timmons)

Timmons argues that the court violated his right to confront the witnesses against him by limiting his defense counsel's opening statement concerning the timing of the superseding indictment.  Specifically, he argues that the court erred by refusing to allow his counsel to comment on the fact that the State initially charged him with hindering and added the other charges against him "over three years later."  This argument has no merit.

During opening argument by Timmons's counsel, the State objected to his reference to a grand jury's indictment three years after the murder.  The State

71

argued the delay was not relevant. Defense counsel argued such evidence "went to the quality of the investigation."

The relevant timing is as follows. The crimes here occurred on August 18, 2013. An initial indictment dated October 15, 2014, charged Timmons with hindering. On October 21, 2016, he was charged in a superseding indictment with additional counts of conspiracy to commit aggravated assault, murder, and endangering an injured victim. On August 29, 2017, the jury granted Timmons's motion for judgment of acquittal on all counts except hindering.

The court ruled the quality of the investigation had nothing to do with the prosecution of the case. It agreed with the State's position and sustained the objection, finding the fact the case was presented to the grand jury three years later was not relevant to any issue.

The purpose of an opening statement is to better prepare a jury to understand the evidence. Wakefield, 190 N.J. at 442. These statements are limited to facts that counsel intends to prove. Ibid. Assertions in opening statements are not evidential. State v. Cordero, 438 N.J. Super. 472, 486 (App. Div. 2014); State v. Anastasia, 356 N.J. Super. 534, 543 (App. Div. 2003).

Contrary to Timmons's assertion, the court did not deprive Timmons of the right to cross-examine witnesses by limiting his defense counsel's opening

argument with respect to the timing of the additional charges in the superseding indictment. The trial court duly advised the jury in the preliminary instructions and final charge that the attorney's comments were not evidence. Defense counsel had ample opportunity to cross-examine all of the State's witnesses who testified at trial.

The timing of the later charges was not relevant to any fact in issue. See N.J.R.E. 401 ("'Relevant evidence' means evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action."). Furthermore, at the close of the State's case, the judge acquitted Timmons of the additional charges, and the jury found him guilty only of hindering. Timmons therefore suffered no prejudice.

For these many reasons, the trial court did not err by sustaining the prosecutor's objection to the opening comments by Timmons's counsel regarding the timing of the additional charges.

VIII.

(Late Discovery – Timmons)

Timmons argues the court erred by failing to preclude Bria's testimony about the contents of a report that the State produced late in discovery. This argument is unavailing.

This is the relevant chronology. In July 2017, Joseph moved to preclude the late discovery of typewritten notes prepared by Detective Rodriguez from an interview of Boone in 2015. Boone told Rodriguez and Valera that Bria claimed Joseph had a knife on the night of Sharp's murder. Joseph's counsel sought a ruling that Bria could not be examined about her statement to Boone because it was "highly prejudicial" to his client.

The court reserved its decision until it could hold a Rule 104 hearing with Rodriguez. Because Rodriguez then was out of state, the court ruled that it would hold the hearing after he returned during which time the defense could interview Boone and Bria about the proposed testimony. It is unclear from the record whether the defense conducted any such follow-up investigation.

At the hearing on August 2, 2017, Detective Rodriguez testified that he received a call from Boone in January 2015 offering additional information about Sharp's murder. He and Valera spoke with Boone at her new residence. Boone advised the officers that Bria, who was dating Joseph at the time of the murder, told her Joseph had a weapon that night, and that she had picked up the knife after it had fallen to the floor and had placed it back into his pocket. Rodriguez subsequently went to Bria's home and recorded her statement on May 7, 2015. Rodriguez determined that Bria's information was unsubstantiated and

had no investigative value.  He typed up his notes, filed them in his computer, and forgot about them.  He discovered the document while "prepping" for trial about "two or three weeks" before the Rule 104 hearing, and turned them over to the prosecutor.  The State provided the document to the defense on July 17, 2017.

The court found the failure to provide the notes was inadvertent, explaining that the detective prepared it some years after the incident, that he no longer was in the same unit, and that he immediately sent it to the prosecutor, who then forwarded the notes to the attorneys.  It found that since the production of the notes, the defense had "more than enough time" to inquire about them and interview witnesses.  The court concluded:  "I don't find that there was anything untoward on the conduct of the State or this witness.  I don't—I further find that there is no undue prejudice to the parties in this case.  And so I will allow testimony regarding the contents of that."

Officer Valera testified that he and Rodriguez re-interviewed Boone in 2015, and that the interview was not recorded.  When asked by Dana's defense counsel whether, "[a]s a result of that interview did you question any—other than—well, did you question anyone regarding the presence of a knife at the scene on William Street[,]" Valera replied:  "In 2015, no, we did not."

Further, Rodriguez testified that he conducted an additional investigation in 2015. After receiving information from Boone, he went to her house and interviewed her. Rodriguez said Boone provided information that she heard secondhand. He also took another statement from Bria in June 2015, and examined Sharp's phone. Bria did not testify at trial on behalf of the State or the defense.

We recognize a defendant in a criminal case is entitled to broad discovery. State in Interest of A.B., 219 N.J. 542, 555 (2014). The purpose of discovery is "to assure the parties every legitimate avenue of inquiry prior to trial to enhance the search for the truth." State v. Burnett, 198 N.J. Super. 53, 58 (App. Div. 1984). A defendant, however, "cannot transform the discovery process into an unfocused, haphazard search for evidence." State v. D.R.H., 127 N.J. 249, 256 (1992).

A party has a continuing duty to provide discovery. R. 3:13-3(f). If a party fails to comply, the court may "order such party to permit the discovery of materials not previously disclosed, grant a continuance or delay during trial, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems appropriate." R. 3:13-3(f). Where circumstances permit, an adjournment or continuance is the preferred remedy.

State v. Clark, 347 N.J. Super. 497, 509 (App. Div. 2002).

An appellate court reviews a trial court's discovery order for abuse of discretion. A.B., 219 N.J. at 554. We generally defer to a trial court's resolution of a discovery matter, "provided its determination is not so wide of the mark or is not 'based on a mistaken understanding of the applicable law.'" Ibid. (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011)). We only will reverse a conviction if the State's discovery violation so prejudiced the defendant that a new trial is required. State v. Blake, 234 N.J. Super. 166, 173 (App. Div. 1989). That standard is not met here.

There was no unfair prejudice to Timmons. As the court found, the State's late discovery was inadvertent, and immediately after receiving Rodriguez's notes from the 2015 interview the prosecutor forwarded them to all defense counsel. Cf. Blake, 234 N.J. Super. at 173 (holding discovery violation prejudiced the defendant because it could not have been inadvertent). Moreover, Timmons's defense counsel had time between July 19, 2017, when the court reserved decision on his motion, to August 2, 2017, when the court held the Rule 104 hearing, to interview Boone and Bria about the matter. It does not appear from the record that anyone did so.

Furthermore, Bria did not testify at trial. Bria told her sister that Joseph

had a knife, not Timmons.  In sum, although we do not encourage similar delays in future cases, there is no support for Timmons's argument that the late discovery of Rodriguez's notes warranted a reversal and remand for a new trial.

IX.

(Fingerprint Evidence – Joseph)

Joseph contends the court erred by admitting testimony from fingerprint experts Curran and Napp.  He argues Curran's testimony was an improper net opinion and that Napp's testimony violated discovery rules.  He also argues the court's failure to grant a new trial based on Napp's testimony resulted in a miscarriage of justice that required reversal.  We reject those contentions, and hold the trial court did not err by admitting the expert opinions of Curran and Napp.

Curran was the investigator who identified the fingerprints and palm print recovered at the crime scene.  On the morning of opening arguments, defense counsel moved to preclude her testimony regarding the bloody palm print because her report did not discuss the methodology used to support her opinion that it belonged to Joseph.  The prosecutor responded that there was no time for Curran to prepare a supplemental report because he planned to call her as a witness that day.

The trial court conducted a Rule 104 hearing to address the "why, wherefore, and how of her palm print opinion." Curran explained at that hearing how she recovered the bloody palm print on the porch railing and removed the section of railing for further examination. She followed the ACE-V method to analyze, compare and evaluate the palm print, and then sent it to another fingerprint examiner for verification.

Curran detailed her methodology, noting that she first determined there was enough detail on the palm print to conduct a side-by-side comparison. She compared the palm print with two "ten print cards" provided by the prosecutor's office. The two cards belonged to Dana and Joseph, and included their fingerprints and their left and right palm prints. Curran looked for general patterns and individual ridge details to find "all common points." She found thirty-five points of comparison. She testified that no points on the palm print were inconsistent with Joseph's print, and concluded they were a match. She sent the bloody palm print to Napp, who verified her results.

Curran acknowledged her report to Sergeant Chopra did not include a discussion of the "ACE-V analysis" of the palm print and did not note whether a verification took place. However, she stated at the Rule 104 hearing that she used the ACE-V methodology to analyze, compare, and evaluate the bloody

palm print recovered at the scene.

Curran testified at trial that the ACE-V methodology was the industry standard for fingerprint identifications and comparisons. She stated the prosecutor's office, where she worked in the Crime Scene Response Unit, followed those industry standards, and that she also followed them when conducting print comparisons. She explained that ACE-V stood for analysis, comparison, evaluation, and verification, and described the first three steps.

Curran used the ACE-V methodology to examine the palm print. After determining the print had sufficient clarity, she scanned it into her computer and compared it to Joseph's ten-print card to find matching points. She found no differences and concluded based on a reasonable degree of scientific certainty that the palm print was a match to Joseph's right palm. Curran then gave the photograph and the inked palm print to Napp to verify and reach an independent conclusion.

Curran testified that she wrote a seven-page report for her supervisor that outlined her investigation. The report indicated she had completed a "formal comparison" of the palm print and determined that it belonged to Joseph. Although her report did not mention that she followed the ACE-V methodology with regard to the palm print, Curran testified that a "formal comparison"

referred to the ACE-V methodology.

The court denied Joseph's motion to bar Curran, finding that Curran's report indicated she had compared the palm print and Joseph's "inked" print, and that her testimony at the Rule 104 hearing amplified the basis for her opinion. The court concluded that, based on the additional testimony, Curran's opinion was "no longer net, if in fact, what she had written in her report was a net opinion."

After Curran's first day of testimony, the prosecutor informed the trial judge he might seek to also qualify Napp as a fingerprint expert, in anticipation of Curran's testimony that Napp performed the verification. Joseph's counsel objected, saying the State had not named Napp as an expert witness. The court reserved its decision, noting Napp was on the State's witness list.

Before calling Napp as a witness, the State renewed its request to call him as an expert. The prosecutor explained:

> in addition to him testifying as to his responsibilities at the autopsy, based on what Dr. Falzon indicated, the State intends to qualify Sergeant Napp as a fingerprint expert to elicit the verification procedures that he did in relation to the fingerprints in this particular case.

He argued expert testimony was necessary in response to attempts by Joseph's counsel to undermine Curran's opinion at trial, noting Curran identified Napp as

the verifier in her report and at the Rule 104 hearing.

The court conducted another Rule 104 hearing. Napp testified that as a member of the crime scene unit he had attended a State Police course on how to compare fingerprints using the ACE-V methodology and that he had performed comparisons for ten years. He explained the prosecutor's office and his lab used the ACE-V methodology. Napp said he went through the ACE-V steps to verify Curran's findings regarding the fingerprints and palm print. He did not write a report in his "secondary" role, explaining, "the verification phase doesn't write a report."

Upon hearing this explanation, the court granted the State's application to allow Napp to offer expert testimony.

The admissibility of opinion evidence rests within the trial court's discretion. State v. J.L.G., 234 N.J. 265, 301 (2018). We are satisfied the court did not abuse its discretion in admitting the expert testimony of Curran and Napp.

A.    Curran

Contrary to Joseph's assertion, the State demonstrated at the Rule 104 hearing, that Curran's methodology met the benchmark of N.J.R.E. 702. See State v. J.R., 227 N.J. 393, 410 (2017) (holding at Rule 104 hearing proponent

of expert's testimony could demonstrate that methodology met benchmark of N.J.R.E. 702, and opposing party could challenge reliability of expert's opinion). Curran testified that the ACE-V methodology was the industry standard and that she used this method when examining the fingerprints and the bloody palm print recovered at the crime scene.

She explained in detail the steps that she followed to analyze, compare and evaluate the print, and to reach the conclusion that it belonged to Joseph. She also testified that although her report indicated only that she did a "formal comparison" of the palm print, the phrase referred to her use of the ACE-V methodology. Curran therefore supported her conclusions with factual evidence and explained her methodology, and the results were reliable. Fortin, 178 N.J. at 597 (holding expert testimony was admissible under N.J.R.E. 702 if methodology was valid, procedures were applied correctly, and results were reliable). Defense counsel had an ample opportunity to cross-examine Curran about her fingerprint analysis and comparison.

Given the circumstances, the court properly admitted Curran's expert testimony and did not abuse its discretion.

B.    Napp

Joseph contends the discovery rules barred Napp's expert testimony

because the State did not notify defense counsel before trial that he would testify as an expert and failed to provide an expert report. Specifically, he argues the State violated Rule 3:13-3(b)(1)(I), by failing to list Napp as an expert witness and to provide the defense with his curriculum vitae and expert report. He further argues the court erred by denying his motion for a new trial on this issue.

In denying Joseph's motion, the trial court found the State had provided all counsel with Napp's curriculum vitae before trial and that all counsel had the opportunity to challenge Napp's qualifications at a Rule 104 hearing. The court also noted that Napp's name appeared on the State's witness list and in Curran's report as an independent verifier. It therefore concluded Joseph "failed to show how the admission of Napp's testimony unfairly prejudiced him."

Napp testified during voir dire that he had worked for the prosecutor's office for eighteen years, of which he spent ten years in the Crime Scene Response Unit, where he performed fingerprint work. He completed a two-week training course on fingerprint identification held by the New Jersey State Police, and stated that his lab used the methodology called ACE-V.

Napp performed the verification phase of the ACE-V methodology for the identifications made by Curran. To verify her work, he performed an independent analysis, comparison, and evaluation of the bloody fingerprint and

the palm print recovered at the crime scene. He explained the ACE-V methodology and the factual bases for his opinions. Napp reached the same conclusions as Curran. In his opinion, to a reasonable degree of scientific certainty, both prints were a match to Joseph.

When asked if he wrote a report in this case about his verification, Napp replied: "No. The verifier doesn't write reports. They just get mentioned in the report by the person who does the initial comparison." Napp did not think it was unusual or irregular that Curran did not indicate in her report that she followed the ACE-V methodology with respect to the palm print, explaining it was "unimportant as long as her conclusions are written."

Rule 3:13-3(b)(1)(I) provides, in relevant part, that post indictment discovery include:

> names and addresses of each person whom the prosecutor expects to call to trial as an expert witness, the expert's qualifications, the subject matter on which the expert is expected to testify, a copy of the report, if any, of such expert witness, or if no report is prepared, a statement of the facts and opinions for which the expert is expected to testify, and a summary of the grounds for each opinion. Except as otherwise provided in R. 3:10-3, if this information is not furnished 30 days in advance of trial, the expert witness may, upon application by the defendant, be barred from testifying at trial . . . .

A trial court has "broad discretion to determine what remedy, if any, it

should impose because of a failure to make expert disclosures." State v. Heisler, 422 N.J. Super. 399, 414-15 (App. Div. 2011), rev'd and remanded on other grounds, No. A-3343-13 (App. Div. Mar. 14, 2016). "Court rules allow, but do not require, a court to bar an expert's testimony if discovery is withheld." Id. at 415. In the exercise of its discretion, a court may consider such factors as: (1) the absence of any intent to mislead; and (2) the absence of surprise or prejudice that would result from admission of the expert testimony. State v. LaBrutto, 114 N.J. 187, 205 (1989); Heisler, 422 N.J. Super. at 415. In this context, prejudice "refers not to the impact of the testimony itself, but the aggrieved party's inability to contest the testimony because of late notice." Heisler, 422 N.J. Super. at 415.

Joseph cannot demonstrate surprise in this case because Napp appeared on the witness list and Curran's report identified him as the verifier. The State called Napp as an expert witness in response to concerns raised in Joseph's motion, which his defense counsel argued on the first day of trial. As the State notes in its brief, the late objection to Curran's report left the State "insufficient time" to put Joseph on notice that Napp would testify as an additional expert. Moreover, the court conducted a Rule 104 hearing which provided defense counsel with the opportunity to challenge Napp's qualifications. Under these

facts, there is no evidence to show that Napp's testimony was a surprise or that the prosecutor's intent was to mislead.

Napp testified that the verifier of fingerprint comparisons did not prepare a report and that, at most, his name would appear in the initial report addressing the first three steps of the ACE-V methodology. In this context, the lack of an expert report did not prevent defense counsel from cross-examining Napp in order to point out any flaws or inconsistencies in his verification, as he performed the same analysis, comparison, and evaluation as Curran.

We are satisfied the trial court did not abuse its discretion by allowing Napp to give expert testimony without prior notice. The lack of earlier notice was not "clearly capable of producing an unjust result." R. 2:10-2. Joseph also is not entitled to a new trial based on the admission of Napp's expert testimony.

X.

(Flight Charge – Joseph)

Joseph contends the court erred by giving the jury a flight charge. He further argues the court's failure to limit the charge to the first three counts led the jury to ascribe consciousness of guilt to the hindering count against him. We reject this claim.

The State requested a jury charge on flight as to all defendants. Counsel

for Joseph objected, arguing there was insufficient evidence that Joseph fled the scene. His attorney argued Joseph did not live at 143 William Street and that he did not have to stay there after Gibbons called the police. The State responded that Joseph was staying at Boone's house on William Street, explaining "that's why his book bag and his clothing" were found inside Boone's house.

The trial court ruled that a jury could interpret Joseph's actions as flight and that "[i]t's evident in this case," noting "[h]e didn't return to the house." Defense counsel acknowledged Joseph did not provide an explanation as to why he left the scene. The court then read the proposed charge. Joseph's counsel did not raise an objection to its contents.

The prosecutor argued flight in summation, telling the jury that while Gibbons was calling 9-1-1, Dana, Joseph, and Timmons fled the scene. He argued: "Are these actions of men who have done no wrong? To leave their friend on the floor before any help arrives? No, ladies and gentlemen. No." He then argued these were actions of men, who were guilty of the crimes charged.

In its final instructions, the court gave the following flight charge:

> There's been some testimony in this case from which you may infer that a defendant fled shortly after the alleged commission of a crime. Defendants deny any flight. The question of whether a defendant fled after the commission of a crime is another question of fact for your determination. Mere departure from a

place where a crime has been committed does not constitute flight.

If you find that a defendant, fearing that an accusation or arrest would be made against him on the charge involved in the indictment, took refuge in flight for the purpose of evading the accusation or arrest on that charge, then you may consider such flight in connection with all the other evidence in the case as an indication of proof of consciousness of guilt.

Flight may only be considered as evidence of consciousness of guilt if you should determine that a defendant's purpose in leaving was to evade accusation or arrest for the offense charged in the indictment. It is for you as judges of the facts to decide whether or not evidence of flight shows a consciousness of guilt, and the weight to be given to such evidence in light of all the other evidence in the case.

The court's instruction on flight largely tracked the Model Jury Charge. See Model Jury Charges (Criminal), "Flight" (rev. May 10, 2010).

We are mindful that "[a]ppropriate and proper jury instructions are essential for a fair trial." State v. Baum, 224 N.J. 147, 158-59 (2016) (quoting State v. Reddish, 181 N.J. 553, 613 (2004)). The court must ensure that the jury receives "accurate instructions on the law as it pertains to the facts and issues of each case . . . ." Ibid. An appellate court reviews a jury charge "as a whole" to determine whether there was any error. State v. Torres, 183 N.J. 554, 564 (2005).

Joseph did not request the trial court to limit the flight charge to the first three counts of the indictment. Because he raises the limitations argument for the first time on appeal, we must apply the plain error standard. R. 2:10-2.

"Flight from the scene of a crime, depending on the circumstances, may be evidential of consciousness of guilt, provided the flight pertains to the crime charged." State v. Randolph, 228 N.J. 566, 594 (2017). The circumstances of flight must "'reasonably justify an inference that it was done with a consciousness of guilt' to avoid apprehension on the charged offense." Id. at 594-95 (quoting State v. Ingram, 196 N.J. 23, 46 (2008)); see also State v. Latney, 415 N.J. Super. 169, 177 (App. Div. 2010) (holding evidence of the defendant's flight was not sufficient to infer that he fled to avoid apprehension for robbery, where court excluded pertinent facts).

Here, the jury could draw reasonable inferences from the evidence that Joseph fled the crime scene to avoid arrest. Contrary to Joseph's assertion, he stayed overnight at Boone's house on the evening prior to the murder and left the scene shortly after Sharp's death. His flight occurred after the commission of the offenses for which he was charged. He knew that Gibbons would discover the body after entering the home. Moreover, he fled the home in a van with Dana and Timmons, at which time, according to Evelyn, Dana told the others

90

what alibi to tell the police.  The surveillance video confirmed that Joseph left the scene shortly before the police arrived.

The jury could draw a reasonable inference that the circumstances surrounding the flight were intrinsically indicative of a consciousness of guilt of all crimes charged, including hindering.  Joseph adopted the alibi as he fled the scene, knowing that police would discover Sharp's body and that the police would consider him as a suspect.  It therefore was not inappropriate for the jury to consider flight to prove the hindering charge.

The jury charge on flight was warranted.

XI.

(Excessive Sentences – Timmons and Dana)

Timmons and Dana argue the court imposed excessive sentences upon them.  These contentions require little comment.

An appellate court reviews a sentence under an abuse-of-discretion standard.  State v. Miller, 237 N.J. 15, 28 (2019).  It must "consider whether the trial court has made findings of fact that are grounded in competent, reasonably credible evidence and whether 'the factfinder [has] appl[ied] correct legal principles in exercising its discretion.'"  State v. Blackmon, 202 N.J. 283, 297 (2010) (quoting State v. Roth, 95 N.J. 334, 363 (1984)).  An appellate court may

not substitute its judgment for that of the sentencing court.  State v. Fuentes, 217

N.J. 57, 70 (2014).  Rather, an appellate court must affirm the sentence unless a

trial court violated the sentencing guidelines, found aggravating or mitigating

factors not based on competent and credible evidence in the record, or applied

the guidelines in such a manner as to "make[] the sentence clearly unreasonable

so as to shock the judicial conscience."  Miller, 237 N.J. at 28 (quoting Fuentes,

217 N.J. at 70).

When sentencing a defendant, a court must identify and balance the

aggravating and mitigating factors pursuant to N.J.S.A. 2C:44-1(a) and (b), and

explain the factual basis supporting its findings.  Fuentes, 217 N.J. at 73, 81;

State v. Bieniek, 200 N.J. 601, 608 (2010).

"It is sufficient that the trial court provides reasons for imposing its

sentence that reveal the court's consideration of all applicable mitigating factors"

in reaching its decision.  Bieniek, 200 N.J. at 609.  "After balancing the factors,

the trial court may impose a term within the permissible range for the offense."

Id. at 608.

A.    Timmons

Timmons argues the court erred by finding aggravating factors three and

nine without adequate reasons, by failing to find any mitigating factors, and by

denying his request to sentence him to a lower degree of hindering.

The trial court found aggravating factors three (risk defendant will re-offend) and nine (need for deterrence) applied to Timmons. N.J.S.A. 2C:44-1(a)(3) and (a)(9). The court based these findings on Timmons's juvenile record as an adjudicated delinquent for aggravated assault on a school employee and for violation of probation. It noted Timmons had "a number of other arrests" for harassment and shoplifting that did not appear to result in adjudication. It further found that Timmons was arrested as an adult in February 2010 on a charge of hindering, noting: "So this isn't the first time that he has faced similar charges."[4] The court also found that Timmons's second indictable offense was a guilty plea to an "unlawful possession of a weapon in an offense that occurred about a year and a half after this offense in Woodbridge. And currently he's awaiting sentence in Pahotcong, New Jersey, well, that's where the offense occurred in Warren County, for distribution of a controlled dangerous substance."

Based on these findings, the court reasonably concluded there was a risk Timmons would commit another offense and there was a need to deter him and

_____

[4] The prosecutor represented at the sentencing hearing that Timmons pleaded guilty to a disorderly persons offense in March 2011.

others from violating the law.

The court also soundly rejected Timmons's arguments to apply mitigating factors one, two, four, seven, eight, nine and ten. N.J.S.A. 2C:44-1(b)(1), (2), (4), (7), (8), (9), (10). Regarding factors one ("defendant's conduct neither caused nor threatened serious harm") and two ("defendant did not contemplate that his conduct would cause or threaten serious harm"), it found that a "very serious crime occurred," that it was a "difficult investigation," and that if Timmons and his co-defendants had remained free it would have posed a "threat to the community." It further found Timmons's actions to hinder the murder investigation caused harm to the well-being of the victim's family. With respect to mitigating factor eight, the court found "[t]he notion that his conduct was the result of circumstances unlikely to recur is belied by the—his prior conviction for—for hindering." The court determined that the other mitigating factors did not merit any discussion.

The court concluded the aggravating factors preponderated over the mitigating factors and that there was a presumption of imprisonment. It sentenced Timmons on count four—second-degree hindering—to a term of seven years. It also sentenced him with respect to a charge in a separate Indictment 16-01-00076 to a concurrent term of twelve months pursuant to a

plea agreement.

The court sufficiently explained its reasons for finding two aggravating factors and no mitigating factors. It based the identification of aggravating factors three and nine on Timmons's juvenile and adult criminal history. His presentence report confirms the court's findings, indicating defendant had two juvenile adjudications and had committed five known offenses as an adult.

Given his repeated criminal conduct beginning as a juvenile, his prior arrest for hindering, and his commission of a second indictable offense while awaiting trial on the present charges, the court was justified in finding Timmons was at high risk of re-offending. Likewise, it was justified in finding the need to deter based on his criminal history and his attempts to hinder a murder investigation. "'Deterrence has been repeatedly identified as one of the most important factors in sentencing,' and 'is the key to the proper understanding of protecting the public.'" Fuentes, 217 N.J. at 78-79 (quoting State v. Megargel, 143 N.J. 484, 501 (1996)). Although the court did not discuss in detail the circumstances of the offense, it adequately explained its application of aggravating factors three and nine to Timmons. Its findings were supported by competent and credible evidence in the record. The court justifiably found no applicable mitigating factors. None of the claimed mitigating factors were

clearly supported by the record. Bieniek, 200 N.J. at 608.

We also reject Timmons's contention that the court erred by failing to sentence him to fourth-degree hindering. Under N.J.S.A. 2C:44-1(f)(2), if a defendant was convicted of a first or second-degree offense, and a sentencing court is "clearly convinced that the mitigating factors substantially outweigh the aggravating factors and where the interest of justice demands, the court may sentence the defendant to a term appropriate to a crime of one degree lower than that of the crime for which he was convicted." "[F]or a sentence to be downgraded, a two-step test must be satisfied." Megargel, 143 N.J. at 495. The sentencing court must be "(1) clearly convinced that the mitigating factors substantially outweigh the aggravating factors and (2) the interest of justice must demand the downgrade." Ibid. Because there were no mitigating factors, the court did not err by failing to impose a downgraded sentence upon Timmons.

Timmons's sentence fell within the middle of the sentencing range. The length of his sentence for second-degree hindering does not "shock the judicial conscience." Miller, 205 N.J. at 128 (quoting Roth, 95 N.J. at 365).

In sum, the court did not abuse its discretion by sentencing Timmons to seven years on count four.

B.    Dana

Dana argues his aggregate fifty-year sentence was excessive because the court improperly found aggravating factors three, six and nine, and no mitigating factors, and failed to impose sentences within the "mid-range terms" for the offenses of hindering, witness tampering, and endangering an injured victim. These arguments are unavailing.

At the sentencing hearing, the trial court appropriately applied to Dana aggravating factors three, the risk "defendant will commit another offense," N.J.S.A. 2C:44-1(a)(3), six, defendant's "prior criminal record and the seriousness of the offenses," N.J.S.A. 2C:44-1(a)(6), and nine, the need for deterrence, N.J.S.A. 2C:44-1(a)(9).  The court found the evidence was clear that on August 18, 2013, Dana

> angrily went and retrieved a knife and purposely and knowingly stabbed Chris Sharp a number of times.  And Chris Sharp died in front of him.  A person who purportedly was a friend or associate, the cousin of his girlfriend, the mother—the cousin of the mother of his child.  And then he left him there to die.  Who came back to concoct a deliberate plan to evade detection.  I know the argument from the defense here is that he was so intoxicated that that somehow is—mitigates his culpability, but that's undermined by the fact that he was able to contrive a plan to—and to convince others to mislead the police in his detection.
>
> This is a very serious crime.  This is the most

A-2567-17T4

serious crime for which one could be convicted in our
State, which carries with it a very serious penalty.

The court also found that Dana's criminal history was poor. It found that he had been arrested "a number of times" beginning as a juvenile in 1996 with an adjudication for receiving stolen property.

Dana was found guilty of disorderly conduct in October 2000, was fined in March 2001 for a "riot," and was the subject of an outstanding drug charge in New York. In 2001 he was indicted for aggravated manslaughter, but apparently pleaded guilty to reckless manslaughter for which he received an eight-year sentence subject to NERA. In September 2011, he was discharged from custody and less than two years later, he murdered Sharp. He had been incarcerated since August 2013.

The court noted that Dana had "caused a lot of hurt not only to the victim's family, but to his own family." It then found that the aggravating factors were "the risk he'll commit another offense, his prior record, a—a homicide, and a need to deter this defendant and others from violating the law." In applying these factors, the court reasonably found Dana's criminal record reflects he was dangerous and a threat to society, and that he was easily provoked.

The court found no mitigating factors, and determined the aggravating factors clearly preponderated.

A-2567-17T4

Dana's presentence report confirmed he had eight complaints as a juvenile, including four adjudications for possession of a CDS, robbery, and two for simple assault. It also confirmed he had eleven offenses as an adult dating back to 2000, which included one felony conviction for manslaughter.

The court rejected defense counsel's arguments that mitigating factors three (defendant acted under strong provocation), and four (substantial grounds tended to excuse defendant's conduct) applied. N.J.S.A. 2C:44-1(b)(3), (4).

The evidence supports the finding that mitigating factor three did not apply because Dana left the scene of the argument at Boone's house to run upstairs to retrieve a knife and then ran downstairs where he stabbed Sharp. He also was not so intoxicated as to excuse his conduct because he created an alibi for himself and co-defendants as they fled the scene. Moreover, at the sentencing hearing, Dana told the court: "I feel remorse for what happened. We all lost somebody, and it's just been hard for everybody. But I'm still maintaining my innocence. I didn't do this to Chris." Dana's request for the judge to apply mitigating factor three for provocation is undermined by his contention that he did not stab Sharp. There was competent credible evidence in the record to support the court's findings of three aggravating and no mitigating factors.

The court merged count one (conspiracy) into count two (murder), and

sentenced Dana on count two to forty years in prison subject to an eighty-five percent period of parole ineligibility under NERA. It sentenced him on count three (endangering an injured victim) to a term of five years, on count five (hindering) to a term of ten years, and on count six (witness tampering) to a term of five years. It ordered count five to run concurrent with count two, count six to run consecutive to count three, and count three to run consecutive to count two. The court imposed a total sentence of fifty years.

Dana's sentences fell within the appropriate statutory ranges. N.J.S.A. 2C:43-6(a)(2), (3). Because the aggravating factors preponderated in the absence of any mitigating factors, the court did not err by sentencing Dana at the higher end of the range. Fuentes, 217 N.J. at 57.

Dana argues the court improperly imposed a term of forty years on the charge of first-degree murder. He argues a term of thirty years subject to NERA would "be sufficient for the purposes of deterrence and punishment." He also argues the court failed to consider the real-time consequence of a parole disqualifier.

A sentencing court must consider the real-time consequences of NERA and the role it plays in fashioning a sentence. State v. Marinez, 370 N.J. Super. 49, 58 (App. Div. 2004). The sentencing court may consider "the judge's

evaluation of the aggravating and mitigating factors in that light." Ibid. After finding two aggravating and no mitigating factors, the court ordered Dana, then thirty-six years old, to serve eighty-five percent of the maximum term on count two (thirty-four years) before being eligible for parole under NERA. Dana therefore would be age seventy when first eligible for parole.

Dana's forty-year sentence for first-degree murder was appropriate, especially considering his prior record that supported the application of aggravating factors. The court found no mitigating factors. Although the real-time consequences of the sentence are serious, Dana's actions also were serious.

The sentence fell within the standard range for first-degree murder of thirty years to life imprisonment. N.J.S.A. 2C:11-3(b)(1). The court duly imposed an eighty-five percent parole disqualifier as mandated under NERA for the first-degree crime of murder. N.J.S.A. 2C:43-7.2(a), (d). The sentence does not shock the judicial conscience. Miller, 205 N.J. at 128.

## XII.

To the extent we have not discussed them expressly, all other arguments raised by defendants lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2567-17T4